UNITED STATES of America,
Plaintiff–Appellee,

v.

Norby E. RABORN, Sr., and Michael D. Gentry, Defendants–Appellants.

No. 88–4385.

United States Court of Appeals,
Fifth Circuit.

April 27, 1989.

W. Eugene Golden, William D. Hall, Shreveport, La., for Raborn.

Wayne J. Blanchard, Shreveport, La., for Gentry.

Sonia P. Cassidy, Asst. U.S. Atty., Joseph S. Cage, Jr., U.S. Atty., Shreveport, La., for U.S.

Before RUBIN, KING, and GARWOOD, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

Two codefendants, Norby E. Raborn, Sr. and Michael D. Gentry, were convicted of various drug-manufacturing and trafficking offenses. The district court found that the police officials who arrested Raborn had probable cause to do so, the evidence was sufficient to support the jury's verdict convicting both defendants for carrying a firearm during a drug trafficking crime, and the search of Gentry's home, which uncovered an unregistered firearm, was pursuant to a valid search warrant. Because the record supports these conclusions, we affirm the judgments.

I.

John Zajac, an agent of the of the Drug Enforcement Agency (DEA), received information from a confidential source that Michael D. Gentry and Norby E. Raborn, Jr. (the son of appellant Raborn) were planning to manufacture illegal drugs in a secluded farmhouse situated in a rural area near Shreveport, Louisiana. The farmhouse was located on Parish Road 443, north of the town of Ringgold, in Bienville Parish. The property on which the farmhouse was located was on the east side of the road, and the farmhouse itself was "a little over" fifty yards from the road. A dirt driveway led straight from the road to the house.

The property on which the house was located was wooded but there was "a small clearing in the immediate vicinity of the farmhouse." At Zajac's request, deputies of the Bienville Parish Sheriff's Department kept the farmhouse under periodic observation for several weeks without witnessing any activity there. Then on December 3, one of the deputies observed a vehicle at the farmhouse. A DEA agent, who had then taken up a post on the property, observed lights at the farmhouse shortly after midnight and smelled the distinctive odor of phenylacetic acid. He informed Zajac who joined him at about 3:00 a.m. Zajac, who is a forensic chemist, and the other DEA agent approached the farmhouse on foot. They worked their way to a point at the rear of the farmhouse. No light from the farmhouse was visible except when a door opened. The agents could then see light inside the house.

Zajac detected the odor of phenylacetic acid, a chemical commonly used in the manufacture of amphetamines, and later, as he circled the farmhouse, the odor of ether, which is used when the manufacturing stage is nearing completion. The next afternoon they found that the reason no light was visible from the house was that it had been securely boarded up and the only opening other than the doors was a large vent equipped with a fan. Zajac organized a party of twenty-seven officers, including federal agents, state police agents, and deputies both from the Bienville Parish and Webster Parish Sheriffs' Offices, to surround the farmhouse, observe any traffic approaching or leaving it, and, after he had obtained a warrant, to enter the farmhouse and make any arrests.

At 10 a.m. on December 4, Zajac obtained a warrant to search the farmhouse based on his affidavit reciting information he had previously received regarding Gentry as well as his observations at the farmhouse. He returned to the farmhouse area about noon. He met with the other members of the police party and assigned a group of officers to posts surrounding the farmhouse. He instructed them that they were to follow any vehicle leaving the farm-

house. If the vehicle went only to Ringgold, appeared to be engaged in a local errand, and appeared likely to return to the farmhouse, the officers were not to stop it. If however, the vehicle appeared to be leaving the area, they were to stop it and arrest the occupants.

Before the warrant could be executed, a brown pickup truck entered the driveway of the farmhouse, its driver honked the horn, and the vehicle remained approximately five minutes. There is conflicting evidence as to whether the officers knew that a passenger entered the vehicle. The vehicle then left the farm property, drove through Ringgold on State Highway 7 and turned onto State Highway 154.

When the pickup left the farmhouse, sheriff's deputies followed it in an unmarked sheriff's automobile, followed by three more police vehicles occupied by a total of seven police officers. When the pickup was on State Highway 154, about six to eight miles from the farmhouse, and appeared to be leaving the area, the first tracking vehicle passed it and then slowed down in front of it, requiring it to stop. Officers in the second vehicle put a red blinking light on their dash to indicate that they were police. The pickup stopped behind the first police vehicle and another vehicle in the pursuing train drew up beside it. Sheriff's Deputy L.H. Haynes drew his gun, approached the truck, and opened the door on the driver's side. The driver, who was later identified as the defendant Norby E. Raborn, Sr., got out of the truck wearing on his left hip a holster that contained a pistol.

As Raborn left the truck, Sergeant Randall Pepper, a Louisiana State Patrol officer who was in the vehicle with the flashing red light, saw Raborn remove the pistol from the holster and reach inside the truck. The other officers handcuffed Raborn and a passenger in the vehicle, Gerald Muse, and forced them to lie on the ground while Pepper searched the front seat of the truck for the gun. Unable to locate it, Pepper asked Raborn where he had put it. Raborn replied that it was under the seat cover and an officer then retrieved the gun.

One of the officers testified that they had arrested Raborn and Muse because they had been seen leaving the farmhouse and had "possibly taken away contraband."

In Raborn's shirt pocket, officers found a receipt for the electricity at the farmhouse in a woman's name. At this point, an officer read Raborn his *Miranda* rights. The officers asked Raborn if they could search his truck. He said that they could, but they found neither drugs nor other weapons. The officers held Raborn and Muse for approximately two hours until Zajac and the remainder of the police party had executed the search warrant.

At about 4:30 p.m. the arrest party approached the farmhouse. One of the officers shouted a warning that they were police and that they had a warrant. They heard popping sounds inside the house and saw flames shooting out from under it. Sergeant Pepper, using a maul, broke open the door and saw Gentry stooped over with flames spreading across the floor from his hands. Gentry then rushed from the building and was arrested.

After the fire, agents searched the debris and found a large quantity of burned glassware, heating mantels, and chemical containers. A forensic chemist identified the contents of a flask found in the debris as phenylacetone, a controlled substance.

A federal agent later obtained warrants to search the homes of Gentry and Raborn. In Gentry's home, the officers found miscellaneous lab equipment, syringes, notebooks with chemical notations, an unregistered shotgun, and numerous other guns. In Raborn's home, officers found a laboratory-equipment-supply catalog and a map showing the location of a house on Lake Bisteneau, a lake near the farmhouse site. After an additional search warrant had been obtained, officers searched the Lake Bisteneau house and found evidence leading them to conclude that it had previously been a lab site or had been prepared to be a lab site. They also found a wooden fan housing that was the size needed to accommodate the fan that had been installed in the burned farmhouse.

Raborn filed a motion to suppress the evidence obtained in the search of his person and his truck on the ground that the officers did not have probable cause for his arrest. Gentry sought to suppress the evidence obtained in the search of his house on the ground that the warrant was invalid. The district court denied both motions. After a five-day trial, the jury convicted Raborn and Gentry on all counts.

## II.

■ An arrest occurs when "under the totality of the circumstances, a reasonable person would have thought he was not free to leave."[1] According to Zajac's testimony, before Raborn had even driven up to the farmhouse Zajac had decided to have members of the police party arrest, and not merely to inquire about the mission of, anyone who attempted to leave the farmhouse. At the suppression hearing, the government conceded that Raborn was arrested when he was stopped and Zajac testified that, even if no evidence incriminating Raborn had been found, he would have been detained until after the search warrant had been executed. Clearly, the officers' stop of Raborn was an arrest.

■ The Fourth Amendment requires that an arrest, with or without a warrant, be made on probable cause.[2] Probable cause exists when the facts available at the moment of the arrest would warrant a person of reasonable caution in the belief that an offense has been or is being committed and that the individual arrested was the guilty person.[3] While the standard is an objective one, it is determined by taking into account the expertise and experience of the police officer.[4] The reasoning of the Supreme Court in *Brinegar v. United States* leads to the conclusion that the reasonable-police-officer test permits the arresting officer to consider both the degree of intrusion into the life of the individual arrested and the exigencies requisite to enforcing the law in the particular situation confronting him.[5]

■ Proof of probable cause requires less evidence than would be required for conviction—that is, less than proof beyond a reasonable doubt—but more than "bare suspicion."[6] As Professor LaFave points out, "This marks the boundaries of the quest ... but obviously does not indicate at precisely what point between those two extremes probable cause is to be located."[7]

As the function of arrest is not merely to produce someone in court for prosecution but also to enable a police officer who believes that the person has committed a crime to complete his investigation,[8] the Model Code of Criminal Procedure permits arrest without evidence sufficient to meet a more-probable-than-not test.[9] The Supreme Court has stated that what is required is only the probability that the arrested person has engaged in criminal activity and not a prima facie showing of his guilt.[10] This does not make clear, however, whether as a matter of constitutional law the Fourth Amendment requires a preponderance of the evidence or merely a substantial probability.[11] The decisions in this

1. *See United States v. Webster,* 750 F.2d 307, 320 (5th Cir.1984).

2. *See United States v. Fortna,* 796 F.2d 724, 739 (5th Cir.), *cert. denied,* 479 U.S. 950, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986); *see also* 1 W. La-Fave, Search and Seizure § 3.2 (2d ed. 1987).

3. *Beck v. Ohio,* 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964); *see also Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed. 2d 441 (1963); *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

4. *United States v. Ortiz,* 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975); *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

5. 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

6. *Id.* at 175, 69 S.Ct. at 1310.

7. W. LaFave, *supra* note 2, § 3.2(e), at 586.

8. *Id.* at 591–92.

9. Model Code of Pre–Arraignment Procedure 14 (1975).

10. *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969).

11. W. LaFave, *supra* note 2, § 3.2(e).

circuit also leave the question unsettled, some stating that a preponderance of evidence is required [12] but at least two indicating that "probability" is satisfied by something less.[13]

Whatever the criterion, the police did not have probable cause to arrest Raborn as an identified individual because, as they testified, they "had no idea" who was driving the brown pickup truck when they stopped it. We therefore consider whether they had probable cause to arrest anyone who drove up to this secluded farmhouse, stopped in front of it for five minutes, blew the vehicle's horn, and attempted to leave the area.

■ A police officer does not have probable cause to arrest someone merely because he sees that person talking to or in the presence of a known criminal.[14] As the Court pointed out in *United States v. Di Re*, the argument that one who accompanies a criminal to a crime rendezvous cannot be assumed to be a bystander is "far-fetched when the meeting is not secretive or in a suspicious hide-out but in broad daylight, in plain sight of passersby, in a public street of a large city." [15] The Court in *Di Re*, however, also observed that other circumstances may warrant such an assumption.[16]

■ The farmhouse that Raborn visited was in an isolated location. It had been under observation for several weeks. The deputies had noticed no traffic to or from it. On the morning of December 4, as a result of his personal observations, DEA agent Zajac had probable cause to believe that phenylacetone was being manufactured in the house and that the process was nearing completion. An unidentified male drove directly up to it in a manner that

indicated that he knew his precise destination. He did not appear to be seeking directions or to be engaged in an innocent errand like delivering milk. He blew the vehicle's horn as if he were expected. The police later observed two white males in the truck and determined that they were leaving the area in the direction of Shreveport. They might reasonably conclude that the driver had picked up a passenger at the farmhouse and was leaving the area.

Under these circumstances, the district court correctly found that the police officers had probable cause, even by the more-probable-than-not test, to believe that a crime was being committed at the farmhouse. The district court's further finding that there was probable cause to believe that the driver of the truck that visited the farmhouse was implicated in some way was not clearly erroneous. Accordingly, we hold Raborn's arrest to have been valid. As the evidence obtained in the search incident to that arrest revealed Raborn's involvement in the conspiracy, we affirm his convictions on Counts I and II for conspiracy to manufacture and aiding and abetting manufacture of phenylacetone.

### III.

Raborn also challenges the sufficiency of the evidence to support his conviction for carrying a firearm during a drug trafficking offense. The standard of review on a motion for judgment of acquittal is whether "viewing the evidence and the inferences therefrom in the light most favorable to the government, a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." [17]

■ To prove commission of the offense charged, the government must establish

12. *See, e.g., United States v. Tinkle,* 655 F.2d 617 (5th Cir.1981), *cert. denied,* 455 U.S. 924, 102 S.Ct. 1285, 71 L.Ed.2d 467 (1982).

13. *See, e.g., United States v. Antone,* 753 F.2d 1301 (5th Cir.), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 65, 88 L.Ed.2d 52 (1985); *United States v. Adcock,* 756 F.2d 346 (5th Cir.), *cert. denied,* 471 U.S. 1102, 105 S.Ct. 2329, 85 L.Ed.2d 847 (1985).

14. *United States v. Di Re,* 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948); *see also Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

15. *Di Re,* 332 U.S. at 593, 68 S.Ct. at 228.

16. *Id.*

17. *United States v. Trevino,* 720 F.2d 395, 398 (5th Cir.1983) (citation omitted).

that the defendant "used or carried" a firearm "during and in relation" to a drug trafficking crime.[18] Since Raborn was properly convicted of engaging in a conspiracy to manufacture phenylacetone, the sole remaining element was proof that he had carried his pistol during and in relation to the commission of that crime. This element of the crime does not depend on proof that the defendant had actual possession of the weapon or used it in any affirmative manner,[19] but it does require evidence that the firearm was available to provide protection to the defendant in connection with his engagement in drug trafficking.

Raborn makes two challenges to the sufficiency of the evidence on this score. First, he contends that the court erred in admitting the pistol in evidence because it was the fruit of questioning in violation of his Fifth Amendment rights, noting that Pepper had questioned Raborn about the location of the gun before giving him the *Miranda* warnings.

The government relies on the public safety exception to the requirement that the *Miranda* warning be given immediately upon arrest. In *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), the Supreme Court found that no violation of a defendant's constitutional rights had occurred when the officers asked a handcuffed suspect the location of a gun they knew he had hidden.[20]

■ Unlike the situation in *Quarles,* however, when the gun was hidden in a place to which the public had access, Raborn's truck, where the police officers believed the gun to be, had already been seized and only the police officers had access to the truck. It is difficult therefore, to find that the public-safety exception applies. However, Raborn had been lawfully arrested and the police might properly search not only his person but the vehicle.[21] Had they continued the vehicle search, they would certainly had discovered the pistol. Its discovery was therefore inevitable, and the introduction of the evidence thereby obtained was not barred by the Fourth Amendment.[22]

■ Second, Raborn contends that he was not carrying the pistol in connection with the drug traffic conspiracy because testimony at the trial established that he had been carrying it for his own protection following a mugging several years earlier; moreover, the pistol was not concealed, and his carrying it in a holster while driving from his home was lawful. A reasonable juror might, however, have concluded that Raborn was carrying his gun in furtherance of his traffic in drugs, a dangerous and illegal activity, to protect himself and to prevent hijacking of the drugs. That he had been mugged some time ago might merely have convinced him of the need to protect himself and his contraband. The juror would not be unreasonable in concluding that Raborn's trip to the farmhouse and his contacts with Gentry were related to or part of the conspiracy to manufacture drugs. That carrying the gun itself was legal under state law is of no moment to the federal offense.

We therefore affirm Raborn's conviction for carrying a firearm during a drug trafficking crime.

### IV.

■ Gentry was also convicted of carrying the firearm found in Raborn's truck pursuant to and in furtherance of a drug trafficking crime.[23] In accordance with the judge's instructions to the jury, in order to convict Gentry of this offense the government had to show that the offense was committed by Raborn pursuant to and in furtherance of the conspiracy and that Gentry and Raborn were members of the

---

**18.** 18 U.S.C. § 924(c).

**19.** *See United States v. Robinson,* 857 F.2d 1006, 1010 (5th Cir.1988); *United States v. Barber,* 594 F.2d 1242 (9th Cir.1979).

**20.** *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).

**21.** *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981).

**22.** *See Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

**23.** 18 U.S.C. § 924(c).

conspiracy at the time Raborn was carrying the pistol *or* that Gentry knew that Raborn was carrying the pistol during and in relation to a drug trafficking crime while Raborn was carrying out Gentry's directions. Therefore, even if Gentry contends he did not know that Raborn possessed the pistol, it sufficed if he was a coconspirator.

█ The trial judge properly charged the jury with the *Pinkerton* instruction, stating that the jury might find Gentry guilty even though he had not participated in the acts constituting the offense if he were a coconspirator because each conspirator is held to be the agent of the other conspirators.[24] A party to a continuing conspiracy may be responsible for a substantive offense committed by a coconspirator pursuant to and in furtherance of the conspiracy, even though that party does not participate in the substantive offense or have any knowledge of it.[25]

█ In denying Gentry's motion for a judgment of acquittal, the trial judge stated that the jury could have found that the evidence showed Raborn and Gentry to be "members of a conspiracy at the time the offense was committed" beyond a reasonable doubt. Considered in the interpretation most favorable to the government, as it must now be after the jury's verdict,[26] the evidence sufficed. Accordingly, we affirm Gentry's conviction on Count III as Raborn's coconspirator.

█ Gentry also contends that the affidavit in support of the search warrant for his home was insufficient and that the results of that search, including an unregistered shotgun, should have been suppressed. In *United States v. Freeman* we held that probable cause to believe that a crime has been committed does not automatically constitute probable cause to search the suspect's home, but the facts recited in the affidavit must tend to connect the premises to be searched with the illegal activity.[27] Gentry contends that Agent Zajac's affidavit discusses only Zajac's past experience with other drug traffickers and does not contain any specific facts regarding Gentry. Zajac's affidavit, however, passes the *Freeman* test for it recited Zajac's personal observations of the drug operation at the farmhouse as well as the tips he had received concerning Gentry's involvement in the crime.

Many items associated with drug trafficking were found at the farmhouse, but other items whose existence Zajac thought likely, such as business records, were not found. The "justification for allowing a search of a person's residence when that person is suspected of criminal activity" is that "few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime."[28] In issuing a warrant, the magistrate is to make a decision based on all the circumstances set forth in the affidavit, including the "veracity" and "basis of knowledge" of the person supplying information.[29] Because evidence of the drug manufacturing operation likely to exist and to further incriminate Gentry had not been found and Gentry's home was the most likely place at which to find it, the affidavit presented to the Magistrate was sufficient to establish probable cause to search Gentry's home. The district court therefore correctly found that the search of Gentry's house was lawful.

For the reasons given, the judgments of conviction are affirmed.

---

**24.** See *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

**25.** *Id.; see also United States v. Sullivan,* 578 F.2d 121 (5th Cir.1978); *United States v. Michel,* 588 F.2d 986 (5th Cir.), *cert. denied,* 444 U.S. 825, 100 L.Ed.2d 47, 62 L.Ed.2d 32 (1979).

**26.** *Trevino,* 720 F.2d at 398.

**27.** 685 F.2d 942 (5th Cir.1982).

**28.** *United States v. Green,* 634 F.2d 222, 226 (5th Cir.1981).

**29.** *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983).