IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 90-4746

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RICKY RAMIREZ, JOSÉ GARCIA,
and JOSÉ CANTU-CANTU,

Defendants-Appellants.

_____

No. 91-4022

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALFREDO GARCIA,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Eastern District of Texas

_____

(June 5, 1992)

Before REAVLEY, JOLLY, and HIGGINBOTHAM, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

This is an appeal of convictions for possessing marijuana with
intent to distribute and conspiring to do so.  Ricky Ramirez and
José Garcia appeal their convictions but not their sentences.  José
Cantu-Cantu appeals from both his conviction and his sentence.  The

fourth appellant, Alfredo Garcia, appeals only from his sentence. The points of error include insufficiency of evidence, admission of evidence, prosecutorial misconduct, failure to strike a venire panel, and improper sentencing. The district court's findings concerning José Cantu-Cantu's objections to the Pre-Sentence Investigation report are not in the record. We must therefore vacate José Cantu-Cantu's sentence and remand his case to the district court for entry of factfindings. In all other respects, we affirm.

I.

The appellants were indicted along with ten others in July of 1990 for one count of conspiracy to possess 2,000 kilograms of marijuana with intent to distribute and three counts of the substantive offense. Count One of the four-count superseding indictment alleged that defendants had conspired to possess 1,000 kilograms of marijuana with intent to distribute between January 1990 and March 23, 1990. The remaining counts alleged three separate substantive violations of 21 U.S.C. § 841, stating that defendants had possessed one hundred kilograms of marijuana with intent to distribute in January, February, and March of 1990 respectively.

On October 3, 1990, the jury returned a verdict finding José Garcia guilty of all counts. The jury found José Cantu-Cantu guilty of the conspiracy count and substantive possession during February and March. The government had dismissed the count against Cantu-Cantu alleging a substantive violation in January. The jury

found Ricky Ramirez guilty of the conspiracy count and the substantive count of possession of marijuana in March, but acquitted him of possession offenses in January or February. Alfredo Garcia had earlier pled guilty to the fourth count only, possession of marijuana with intent to distribute in March of 1990.

The government charged the transport of about 2,000 kilos of marijuana by an eighteen-wheel semi-tractor trailer from Alfredo Garcia's house in South Texas to Noel Ramirez's house in Dayton, Texas. The government argued that the marijuana was transported in monthly shipments in January, February, and March of 1990. Each time the tractor-trailer rig was unloaded at Alfredo Garcia's house, and the marijuana was hidden in a shed for several days. The conspirators loaded the marijuana on to the rig, camouflaging it with purchased cabbage and ice. The conspirators would then drive the rig to Noel Ramirez's home near Dayton where the marijuana was unloaded and taken away by smaller vehicles.

Noel Ramirez, testifying for the government, described the operation after it arrived at his house but could not identify any appellant as being present except José Cantu-Cantu. Several conspirators unloaded the marijuana in his garage. The rig then drove away and, after a short interval, pickup trucks or vans arrived at Noel Ramirez's house to pick up the marijuana. Noel Ramirez received $5,000.00 for the use of his garage.

The government's case depended heavily on the testimony of witnesses with whom plea agreements had been negotiated. Rene Vela-Garcia was the key witness. Vela-Garcia testified that he

worked with Ricky Ramirez and José Garcia, among others, unloading and loading marijuana and covering the marijuana with cabbages at Alfredo Garcia's house in January, February, and March, 1990. Vela-Garcia also testified that José Garcia and Ricky Ramirez had driven with Vela-Garcia to Dayton to deliver the marijuana on several occasions.

Vela-Garcia detailed Ricky Ramirez's and José Garcia's participation in the "March load" of marijuana. According to Vela-Garcia, José Garcia and Ricky Ramirez helped load the marijuana at Alfredo Garcia's house and drove from Alfredo Garcia's house to Dayton in a blue pick-up truck owned by José Garcia's father, accompanying the March load of marijuana. After delivering the marijuana at Noel Ramirez's house, some of the conspirators rented a room at an EconoLodge.

The government also relied on the testimony of agents from the Federal Drug Enforcement Agency, the Federal Bureau of Investigation, and officers from the Texas Department of Public Safety who participated in the surveillance and arrests of the conspirators and who presented at trial photographs and documents obtained during the operation. With the cooperation of Noel Ramirez, the government began surveillance of his house on March 23, 1990. The agents testified that a tractor-trailer rig arrived at Noel Ramirez's house, and marijuana was unloaded at the house. The agents then followed the rig to an EconoLodge where they saw several people leave the rig and enter Room 132 of the motel.

After placing the EconoLodge under additional surveillance, the agents photographed people entering and leaving the EconoLodge. They saw Ricky Ramirez and a companion leave the motel in a blue car that they had seen arrive earlier. The agents also testified that they saw José Garcia drive up to the EconoLodge in a yellow pick-up truck, park in the EconoLodge parking lot, enter Room 132 of the motel, exit Room 132 with two other alleged conspirators, enter his pick-up truck, and prepare to leave the motel. The agents arrested José Garcia and his two companions as they were about to drive away. After these arrests, they entered Room 132 and arrested two other alleged conspirators. The agents searched the pockets of the arrestees and discovered several documents that were later introduced at trial, including a business card carried by José Garcia with telephone numbers of several of the conspirators.

The agents released José Garcia after his initial arrest outside the EconoLodge but arrested him again later in McAllen, on June 11, 1990. In the interview following his second arrest, Garcia stated that "he was not responsible, that Jesus Garcia was responsible for the transportation of the marijuana." When Shelton asked how much money he received for loading and unloading marijuana, Garcia stated that "he did not receive any money for loading or unloading the marijuana." Garcia also expressed fear that "Daniel Bautista [a co-conspirator] would have people come up from Mexico and do harm to him and his family."

The government also presented documents obtained in a search of Cantu-Cantu's motel room at the EconoLodge. Cantu-Cantu was arrested while driving a marijuana-laden truck from Noel Ramirez's house. Agent Shelton read him his Miranda rights and drove him to a Justice of the Peace where Cantu-Cantu signed a consent form purportedly authorizing the government to search Cantu-Cantu's motel room at the EconoLodge. The government searched the room and discovered various motel and airline receipts that tended to confirm Vela-Garcia's testimony about the travels of the members of the conspiracy.

## II.

### A.   Admission of José Garcia's Inculpatory Statements

José Garcia contends that the district court erred in admitting into evidence his statements made to Agent Shelton, because those statements were elicited in violation of his Fifth Amendment rights. We need not reach the substantive merits of this contention, however, because we find that the admission of the challenged statements was harmless beyond a reasonable doubt.

After advising him of his Miranda rights, Shelton asked José Garcia to sign a form waiving his rights. Garcia refused to sign the form but told Agent Shelton that he would answer questions. Shelton testified both in a suppression hearing and at trial that Garcia was reluctant to speak because he feared his co-conspirators would kill him. Shelton therefore terminated the interview, writing on the waiver form that "Garcia did not wish to say any more because he was afraid for his life." Shelton returned about

an hour and a half later to renew his conversations with José Garcia accompanied by Agent Humphries from the Drug Enforcement Agency.  According to Shelton's testimony at trial, Garcia added nothing to his earlier statements.

José Garcia objects only to the admission of testimony regarding his second interview with Shelton.  However, Shelton testified that Garcia made no new statements in the second interview.  The mention of the second interview was harmless beyond a reasonable doubt.  Arizona v. Fulminante, 111 S. Ct. 1246, 1266 (1991).

B.    Admission of José Garcia's Business Card

José Garcia also contends that the business card seized from him after his arrest outside the EconoLodge should have been excluded from evidence because he was arrested without probable cause.

Probable cause exists when the facts and circumstances known to the arresting officer are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed and the arrested person is the guilty person.  United States v. Rocha, 916 F.2d 219, 238 (5th Cir. 1990); United States v. Raborn, 872 F.2d 589, 593 (5th Cir. 1989).  Mere association with a known criminal does not, by itself, create probable cause for arrest.  Sibron v. New York, 392 U.S. 40 (1968); United States v. Di Re, 332 U.S. at 593; United States v. Ingrao, 897 F.2d 860, 864 (7th Cir. 1990); Raborn, 872 F.2d at 594; Hillison, 733 F.2d at 697; United States v. Everoad, 704 F.2d 403, 406 (7th Cir. 1983).

"[I]n order to find probable cause based on association with persons engaging in criminal activity, some additional circumstances from which it is reasonable to infer participation in criminal enterprise must be shown." Hillison, 733 F.2d at 697.

We find such additional circumstances. José Garcia was not only seen in the company of suspected drug traffickers. He was seen meeting with these suspects while they were engaged in an ongoing conspiracy. Noel Ramirez had told officers in charge of the surveillance that the conspirators "were going to get some vehicles to take the marijuana from my house." This information was consistent with Noel Ramirez's accounts of the two earlier marijuana deliveries, in which a semi-tractor-trailer delivered marijuana to Noel Ramirez's house and vans and pick-up trucks took the marijuana to Houston for distribution.

The officers, therefore, had reason to believe that, after the occupants of the semi-tractor-trailer unloaded the marijuana, other conspirators would arrive at Noel Ramirez's house in smaller vehicles to pick up the marijuana. The officers could reasonably believe that José Garcia was meeting with the occupants of the rig before driving his pick-up truck to Ricky Ramirez's house to help there.

José Garcia's behavior was consistent with such an inference. Although the testimony is ambiguous, B.J. Lawrence, the officer observing the motel, testified that he saw several "Latin males" coming out of Room 132 and "coming in and out of" various vehicles, including "the eighteen-wheeler parked on the end." At trial,

Lawrence identified José Garcia as one of the people who entered and exited the different vehicles. DEA Agent Humphries, the arresting officer, also testified that Lawrence told him before the arrest that "Mr. Garcia had been seen around the eighteen-wheeler."

A reasonable officer might then conclude that José Garcia was connected not only to the occupants of Room 132 but also to the rig that had transported the marijuana to Noel Ramirez's house immediately before it arrived at the EconoLodge. The officers also knew that others would soon return to Noel Ramirez's house in smaller vehicles such as pick-up trucks to take the marijuana to Houston. It was then reasonable to infer that José Garcia was a knowing member of the conspiracy involving the rig and was leaving the parking lot in a pick-up truck as part of the ongoing conspiracy. See United States v. Raborn, 872 F.2d 589, 594 (5th Cir. 1989). The district court's determination that the officers had reason to believe, more probably than not, that José Garcia was implicated in the conspiracy was not clearly erroneous. We hold that evidence obtained incident to José Garcia's arrest was admissible.

C. Failure to Declare a Mistrial After Hermani's Testimony

Ricky Ramirez contends that the district court erred in failing to declare a mistrial after Marisole Hermani, Ricky Ramirez's sister and a witness for the prosecution, raised her Fifth Amendment privilege while testifying. We review the ruling on a request for mistrial for abuse of discretion. United States v. Merida, 765 F.2d 1205, 1220-21 (5th Cir. 1985). We ask if the

stricken evidence, viewed in the context of the whole trial, is so highly prejudicial that it would have had a substantial impact on the jurors' verdict. United States v. Baresh, 790 F.2d 393, 402 (5th Cir. 1986).

Hermani testified regarding the uniform that she wore at work, the condition of her car, and her impressions of a photograph of a car in front of the EconoLodge that the government had introduced into evidence. Hermani stated that the car in the photograph was not her car. On the suggestion of defense counsel, the district court advised Hermani as to her Fifth Amendment privilege and later appointed counsel to represent her. After consulting with counsel, Hermani raised her Fifth Amendment privilege and refused to testify further.

The district court was well within its discretion not to declare a mistrial. Hermani's testimony had little impact on Ricky Ramirez. The district court instructed the jury to disregard the testimony.

Ricky Ramirez also contends that the district court abused its discretion by failing to declare a mistrial after the prosecutor referred to Hermani's testimony in his closing argument. At trial, Ricky Ramirez's counsel objected to the prosecutor's remark but did not request a mistrial. The district court again cautioned the jury to disregard Hermani's stricken testimony. There was no abuse of discretion.

D.    Admission of Photograph of Hermani's Car

Ricky Ramirez contends that the district court erred in not excluding a photograph of Hermani's car from evidence. According to Ricky Ramirez, this photograph was irrelevant and therefore should have been excluded under Fed. R. Evid. 402. The decision to admit evidence is within the sound discretion of the trial court. Jon-T Chem., Inc. v. Freeport Chem. Co., 704 F.2d 1421, 1417 (5th Cir. 1983). The photograph of Hermani's car was admitted to corroborate Vela-Garcia's testimony that the car that arrived at the EconoLodge to pick up Ricky Ramirez was driven by Ricky Ramirez's sister. It was relevant for this purpose.

E. Prosecutor's Reference to Lack of Evidence Supporting Ricky Ramirez's Alibi

During trial and during his closing argument, Ricky Ramirez relied on the alibi that he had attended a party during the events of March. In his rebuttal argument, the prosecutor attacked Ricky Ramirez's alibi by pointing to the lack of any evidence to support such a defense, stating

> "But you see, if there were forty or fifty people at this party that all saw Ricky Ramirez, wouldn't you think they would have called on [someone] that wasn't related to [Ramirez]? If there really was such a party, where kegs of beer were purchased, don't you think there would be just one receipt, one cancelled check, just one piece of hard evidence to show you that party ever existed to begin with, and if so, Ricky Ramirez was there?"

Ricky Ramirez's counsel objected, on the grounds that, with this remark, the prosecution was shifting the burden of proof to defendant. The district court overruled the objection.

Ricky Ramirez contends on appeal that the prosecutor's comment on Ricky Ramirez's failure to produce evidence to rebut the

government's case constituted misconduct.  We disagree.  The prosecution may "comment on the failure of the defense to counter or explain the evidence presented."  United States v. Iredia, 866 F.2d 114, 118 (5th Cir. 1989).  The prosecutor did no more.

F.    Failure to Declare a Mistrial After Dismissal of Six Defendants from Case

After the trial started, six of the remaining nine defendants, including appellant Alfredo Garcia, pled guilty and were dismissed from the case on September 26, 27, and 28.  On each occasion, the district court gave cautionary instructions to the jury, telling them to disregard the dismissal of defendants.  The district court did not tell the jury that the dismissed defendants had pled guilty but only that they had been dismissed from the case.  Defendants moved repeatedly for mistrial, urging that dismissing the six co-defendants would prejudice them.  The district court denied the motions for mistrial, finding that cautionary instructions would protect defendants.  The district court again instructed the jury to disregard the dismissal of the six defendants before the jury's deliberations.

All defendants except Alfredo Garcia contend that the district court erred in failing to declare a mistrial when six co-defendants pled guilty and were dismissed from the case during trial. Defendants concede that the district court gave "carefully worded" instructions to the jury to disregard the "dismissal" of the co-defendants and the jury was never told that co-defendants had pled guilty.  Nevertheless, defendants contend that curative instructions were insufficient to cure the prejudice.

-12-

Failure to grant a mistrial is reviewed for abuse of discretion only. United States v. Merida, 765 F.2d 1205, 1220-21 (5th Cir. 1985). Curative instructions are usually sufficient to protect remaining defendants from prejudice arising out of the guilty pleas of co-defendants. United States v. DeLucca, 630 F.2d 294, 298 (5th Cir. 1980).

We find no abuse of discretion. There is no indication that the jury ever learned of the guilty pleas. They were told only that the co-defendants were dismissed from the case. The district court instructed the jury both during the trial and in its final instructions to disregard the dismissals, stating that "you should not consider the fact that six of defendants are no longer part of this trial." Under the circumstances, these instructions were sufficient to cure any prejudicial impact from the successive dismissals of defendants.

G.   Sufficiency of the Evidence Supporting Ricky Ramirez's and José Garcia's Conviction

Ricky Ramirez and José Garcia challenge the sufficiency of the evidence to support their convictions for conspiracy and also the substantive offense of possession of marijuana with intent to distribute in March, 1990. These contentions have no merit.

To prove possession of a controlled substance with intent to distribute, the government must show beyond reasonable doubt that defendant (1) possessed the illegal substance (2) knowingly (3) with intent to distribute it. United States v. Olivier-Becerril, 861 F.2d 424, 426 (5th Cir. 1988). To prove conspiracy to possess with intent to distribute, the government must show that (1) there

-13-

was an agreement to violate federal narcotics laws; (2) Ricky Ramirez and José Garcia knew of the agreement; and (3) Ricky Ramirez and José Garcia voluntarily participated in the agreement. United States v. Gallo, 927 F.2d 815, 820 (5th Cir. 1991). We view the evidence in the light most favorable to the jury's verdict and affirm if a reasonable trier of fact could have found that these elements were proven beyond a reasonable doubt. Glasser v. United States, 315 U.S. 60 (1942); United States v. Palella, 846 F.2d 977 (5th Cir. 1988).

Vela-Garcia testified at trial that he saw José Garcia at the February unloading and loading of marijuana at Alfredo Garcia's house.[1] He also testified that he saw both Ricky Ramirez and José Garcia help load the marijuana on to the rig and cover it with ice and cabbage in March, 1990.[2] According to Vela-Garcia, Ricky

---

[1]On direct examination by the prosecution, Vela-Garcia testified concerning the February load as follows:

Q:        Who helped you dig and move the cabbage . . . put the marijuana in the trucks?

A:        Me, Ricky Ramirez . . . Jose Garcia helped.

[2]On direct examination by the prosecution, Vela-Garcia testified as follows:

Q:        Were you present when the third load of marijuana arrived at Alfredo Garcia's house?

A:        Yes, I was.

Q:        Who else was present with you?

A:        Me, . . . Jose Garcia, Ricky Ramirez, . . . .

Q:        After the marijuana was re-wrapped, when was the next time that you had any contact with it?

-14-

Ramirez joined the other conspirators in the haul of marijuana to Dayton, following the rig laden with marijuana in a blue pick-up truck. Vela-Garcia also testified that Ricky Ramirez had re-wrapped marijuana for Jesus Garcia. Finally, Vela-Garcia testified about the remarks made by Jesus Garcia that "me, Ricky Ramirez, and José Garcia . . . all of us were going to work together smuggling the marijuana."

If the jury believed this testimony, it was entitled to conclude that Ricky Ramirez and José Garcia knowingly possessed the marijuana, and from its large quantities, infer their intent to distribute it. United States v. Moreno-Hinojosa, 804 F.2d 845, 847 n.2 (5th Cir. 1986). This testimony, if believed, would also support an inference that they knowingly participated in an agreement to assist in the transportation of marijuana by loading and unloading that marijuana at Alfredo Garcia's house.

---

A:      Loading it.

Q:      When did that take place?

A:      Around March the 21st.

Q:      All right. Who was present when it was re-loaded?

A:      All of us. Me, Jesus Garcia, Juan Garcia, Alfredo Garcia, Ricky Ramirez, Ruben de los Santos, Jesus Alvarez were present.

.    .    .

Q:      Now, did you use the same method again and got get [sic] cabbage?

A:      We went to Teddy Bertuca's, me and Mencho Garcia sought the cabbage, bring it back, me and Ricky and Mencho dig it and again loaded the marijuana, covered it up again.

-15-

Ricky Ramirez and Garcia contend that Vela-Garcia's testimony implicating them in the conspiracy was inadmissible hearsay. They did not so object at trial, and we review for plain error only. Fed. R. Evid. 51; United States v. Blankenship, 746 F.2d 233, 238 n.1 (5th Cir. 1984).

According to Vela-Garcia's testimony, Jesus Garcia told Vela-Garcia that he had hired Ricky Ramirez and José Garcia to help smuggle marijuana as part of Jesus Garcia's general description of the conspiracy. The existence of this conspiracy was amply corroborated by independent evidence--Vela-Garcia's other testimony concerning his personal knowledge of Ricky Ramirez's and José Garcia's participation in the conspiracy. See Bourjailly v. United States, 482 U.S. 171, 180, 181, 107 S. Ct. 2775, 2781 (1987). Vela-Garcia's testimony about Jesus Garcia's statements was, therefore, admissible as a co-conspirators' statement made in the course of and in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E). United States v. Miliet, 804 F.2d 853, 856 (5th Cir. 1986). There was ample admissible evidence to support the convictions for both conspiracy and possession of marijuana with intent to distribute.

The arguments are little more than attacks on Vela-Garcia's credibility. The district court properly instructed the jury that the jury could consider Vela-Garcia's status as a government informant in evaluating his credibility. The evidence is sufficient to sustain the conviction of Ricky Ramirez and José Garcia.

H.   Defense Counsel's Remark at Voir Dire that Five Defendants Had
     Pled Guilty

In voir dire, Jesus Garcia's counsel, Mark Steven Byrne, stated that five of the original fourteen indicted defendants had pled guilty before trial.  This statement does not appear in the record because defendants did not include any transcript of the voir dire proceedings as part of the record on appeal.

However, after voir dire, the district court sua sponte noted Mr. Byrne's statement, noted that there was "no . . . objection by any of the defendants," and asked counsel whether "anybody wants me to instruct the jury now or in closing in the final charge, or at any time."  None of the counsel for defendants made any suggestions in response to the court's offer.  Indeed, Mr. Byrne proceeded to defend his remark regarding the five defendants' guilty pleas.

The district court, therefore, concluded that "I will handle it [in] the way [that] I deem appropriate in the final charge." While suggesting that cautionary instructions to the jury might be appropriate, the court stated that "I don't foresee what is going to be included in the charge this early in the trial."  Again, no defendant raised any objection or demanded that special instructions be included in the final charge to cure any taint created by the opening statement of defense counsel.

The district court did not refer in his final charge to the five defendants who pled guilty before trial.  The instructions included only the charge that "[the jury] should not consider the fact that six of the defendants [who pled guilty after trial commenced] are no longer part of this trial when you are called

-18-

upon to [reach a verdict]." No defendant objected to this omission.

José Cantu-Cantu now contends for the first time on appeal that the opening statement of Mr. Byrne so tainted the jury that he ought to receive a new trial. Because defendants failed to request any cautionary instruction, we review the district court's failure to give such instructions for plain error only.

We cannot find that the "substantive rights of the accused were blatantly and severely jeopardized" by the district court's failure to give curative instructions such that the failure constituted plain error. United States v. DeLucca, 630 F.2d 294, 298 (5th Cir. 1980). The jury heard a reference to the guilty pleas of the five defendants only once, when one of defendants' attorneys referred to those pleas. Neither the government nor defendants ever repeated this reference to the five guilty pleas.

The district court could well have concluded that any further reference in the charge to the five defendants' guilty pleas could only highlight a single remark made at the outset of the three-week trial. The district court did not plainly err in failing to give curative instructions or take other corrective action sua sponte. United States v. Rothman, 463 F.2d 488, 490 (2nd Cir. 1972).

I.  District Court's Rulings concerning Jurors

Cantu-Cantu argues that a juror's failure to disclose that she knew the prosecutor's wife from PTA prevented him from intelligently striking the jury. The district court, however, excused the juror in question before jury deliberations. Cantu-

-19-

Cantu's inability to challenge the juror peremptorily could not have prejudiced him.

Cantu-Cantu also contends that the district court erred in excusing another juror before deliberations, on the ground that the juror had been napping during the trial. We review the district court's decision to discharge jurors before the jury's deliberation for abuse of discretion, and reverse only upon a showing that the discharge prejudiced defendant. United States v. Dumas, 658 F.2d 411, 413 (5th Cir. 1981). Cantu-Cantu has shown no prejudice.

Finally, Ricky Ramirez contends that the district court erred in failing to declare a mistrial after the jury broke into laughter at a remark made by Vela-Garcia while he was testifying. In describing how a fight was broken up, Vela-Garcia stated "the party broke up." The jury apparently was amused by the reference to a fight as a party and laughed. In response, the district court admonished the jury that "this [trial] is a serious matter, and it deserves all of our attention." The district court did not abuse its discretion in refusing to declare a mistrial.

J.   Violation of Fed. R. Evid. 615

During trial, F.B.I. Agent Shelton and D.E.A. Agent Humphries remained in the courtroom. At the beginning of trial, Cantu-Cantu invoked "the Rule"--Fed. R. Evid. 615--in order to exclude one of these two government agents from the courtroom. The district court ruled, over defense objection, that both agents could remain in the courtroom as representatives of the government while other witnesses were testifying but that Shelton must leave the courtroom

while Humphries testified and Humphries must leave the courtroom while Shelton testified.  The district court stated that given the "scope and the length" of the investigation, "it is necessary to have two people represent the government."  Both government agents in the courtroom eventually testified at trial.

José Cantu-Cantu now contends on appeal that, by failing to exclude one of the two government agents from the courtroom, the district court violated Fed. R. Evid. 615.  Rule 615 provides that:

> "At the request of a party, the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion.  This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause."

Cantu-Cantu contends that Rule 615 gives the district court the power to except only <u>one</u> person from the Rule's coverage as the government's representative.

We will assume <u>arguendo</u> that the district court erred in allowing the government to designate more than one witness as a "representative" who was exempt from the Rule.  <u>See</u> <u>United States v. Pulley</u>, 922 F.2d 1283, 1286 (6th Cir. 1991); <u>United States v. Farnham</u>, 791 F.2d 331, 335-36 (4th Cir. 1986); <u>see</u> <u>also</u> <u>United States v. Causey</u>, 609 F.2d 777, 778 (5th Cir. 1980) ("from [Rule 615(2)'s] language, it would reasonably be argued that the rule does not grant counsel for a party the right to designate more than one representative of the party to be present during the proceedings").

-21-

Even so, Jose Cantu-Cantu has shown no prejudice from this error. The district court sequestered Shelton and Humphries whenever either was testifying, thus minimizing the opportunity that each would have to tailor their testimony. Compare Farnham, 791 F.2d at 335 ("we hold that the district court erred in refusing to sequester Agent Martin, if not during the entire trial, at least during the testimony of his colleague [another government case agent]") (emphasis added).

Cantu-Cantu has not shown how he was prejudiced by the extra government agent in the courtroom when neither Shelton nor Humphries were testifying. Absent a specific showing of prejudice, there is no reversible error. United States v. Bobo, 586 F.2d 355, 366 (5th Cir. 1978) ("even if there were a violation of the rule [615], 'the defendants must demonstrate that the [violation] created sufficient prejudice to require reversal'") (quoting United States v. Warren, 578 F.2d 1058, 1076 (5th Cir. 1978) (en banc)); William L. Comer Family Equity Pure Trust v. Commissioner of Internal Revenue, 953 F.2d 140-41 (6th Cir. 1992).

K. Admission of documents seized in allegedly illegal search of Cantu-Cantu's motel room

Agent Shelton followed a green pick-up truck and blue van after another officer radioed instructions to him. Shelton eventually pulled the truck over and arrested its occupants, including José Cantu-Cantu. Bundles of marijuana were in the truck.

Shelton took Cantu-Cantu to the offices of a local justice of the peace, and another government agent, Agent Kuykendall, read

-22-

Cantu-Cantu his <u>Miranda</u> warnings in Spanish. Agent Kuykendall then read a consent form to Cantu-Cantu in Spanish and asked him to consent to a search. The consent form was a standard pre-printed form authorizing search and seizures in residences. The agents, however, crossed out the first reference to "residence" and inserted in handwriting, "Room 227, Gateway Motel, Richey St. Houston TX." The altered form read as follows, with the bracketed portions added by hand:

> "I, [José Cantu], having been informed of my constitutional right not to have a search made of the premises hereinafter mentioned without a search warrant and of my right to consent to such a search, hereby authorize [agents of the DEA and DPS] peace officers to conduct a complete search of my [Room, Room 227, Gateway Motel, Richey St. Houston, Texas]. These officers are authorized by me to take from my residence, out houses, and motor vehicles, if any, any letters, papers, materials, or other property which they may desire. This written permission is being given by me to the above named officers voluntarily and without threats or promises of any kind and is given with my full and free consent."

Both Kuykendall and Shelton explained the form in English and Spanish, and both testified in a suppression hearing that Cantu-Cantu's signing of the form was free from threats, coercion, or pressure. After Cantu-Cantu signed the form, the agents searched his motel room, finding receipts from airline trips and motels that tended to corroborate Vela-Garcia's account of the conspiracy. These receipts were introduced at trial over Cantu-Cantu's objection, after the district court held a hearing to determine the voluntariness of Cantu-Cantu's consent.

Cantu-Cantu now challenges the finding of voluntary consent, admitting these receipts. In support of this contention, Cantu-

Cantu notes that he had been in confinement for about four hours when he signed the consent form and that he had not used the restroom or had anything to eat or drink. Cantu-Cantu also notes that, while the form authorizes a search of his motel room, it authorizes <u>seizures</u> only from Cantu-Cantu's residence, out houses, and motor vehicles.

In reviewing the district court's denial of a motion to suppress evidence, we review the district court's factfindings for clear error only. <u>United States v. Lopez</u>, 911 F.2d 1006, 1008 (5th Cir. 1990). All evidence is viewed in the light most favorable to the prevailing party. <u>United States v. Reed</u>, 882 F.2d 147, 149 (5th Cir. 1989). To determine if the finding that the consent was voluntary is supported by a preponderance of the evidence. <u>United States v. Hurtado</u>, 905 F.2d 74, 76 (5th Cir. 1990) (en banc).

The district court found on the basis of the evidence presented in a suppression hearing that Cantu-Cantu consented to the search of his hotel room without being "overreached, coerced, or threatened." None of Cantu-Cantu's allegations indicate that this finding was clearly erroneous. Cantu-Cantu does not contend that any government agent used any coercive methods.

Cantu-Cantu's objections to the wording of the consent form are equally meritless. Under the circumstances, the district court could conclude that the second use of the word "residence" referred to Cantu-Cantu's motel room, not his legal residence in McAllen, Texas. The form signed by Cantu-Cantu was a pre-printed form. The reference to "residence, outhouses, and motor vehicles, if any" was

boiler-plate language that, by oversight, was not altered as was the first reference to "residence."

It is undisputed that Cantu-Cantu signed the form free of restraints. It is also undisputed that Agent Shelton read Cantu-Cantu his <u>Miranda</u> rights before the signing, which were translated into Spanish for Cantu-Cantu by Agent Kuykendall. According to the uncontradicted testimony of Agent Kuykendall, Cantu-Cantu was "very cooperative" and had "no problem" with the search of his motel room, because there was "nothing in there that we couldn't see." Under the totality of the circumstances, we find that the district court did not err in finding that Cantu-Cantu voluntarily consented to the search of the motel room. <u>United States v. Yeagin</u>, 927 F.2d 798, 800-801 (5th Cir. 1991).

L.    <u>Denial of Requested Jury Instructions</u>

Cantu-Cantu contends that the district court erred in its instructions to the jury. The district court's instructions stated that the jury was entitled to "decide how much [of the testimony] you believe" and that the jury did not have to "accept all of the evidence as true or accurate." Cantu-Cantu contends that the district court should have charged the jury that they were entitled to decide how much of the testimony they believed "if any" and that the jury did not have to accept all "or any" of the evidence.

We ask "whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs the jurors as to the principles of law applicable to the factual issues confronting them." <u>United States v. Stacey</u>, 896 F.2d 75, 77 (5th

Cir. 1990). We find that Cantu-Cantu's contention is meritless. The instructions fairly told the jury that it could reject any of the evidence. Cantu-Cantu's requested instructions were implicit in the instructions given.

M.   Sentencing of José Cantu-Cantu and Alfredo Garcia

Both Alfredo Garcia and José Cantu-Cantu challenge their sentences and the district court's sentencing procedures on appeal. José Cantu-Cantu contends that the district court erred in refusing to give him a two-point reduction of his sentence for acceptance of responsibility and in increasing his sentencing range by three points for being a marijuana broker or leader of the conspiracy. Alfredo Garcia contends that the district court erred in attributing the January and February loads of marijuana in calculating his sentence. Finally, both contend that the district court violated Fed. R. Crim. P. 32(c)(3)(D) by failing to enter factual findings concerning their challenges to their Pre-Sentence Reports.

1.   José Cantu-Cantu

Fed. R. Crim P. 32(c)(3)(D) provides that:

"If the comments of the defendant and the defendants' counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to each allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing. A written record of such findings and determinations shall be appended to and accompany any copy of the presentence report thereafter made available to the Bureau of Prisons."

Cantu-Cantu filed numerous written objections to the findings and recommendations of his Pre-Sentence Investigation Report. He disputed the PSI's finding that he owned the marijuana transported in the February and March loads and the PSI's recommendation that he be considered a "broker" of marijuana under the sentencing guidelines. He also objected that Vela-Garcia, the witness the PSI relied upon in making these assessments, was unreliable and that the other undisputed facts indicated that Cantu-Cantu took orders from his brother.

We have no transcript of the sentencing hearing, and no other record of the district court's findings. "Where there are disputed facts material to the sentencing decision, the district court must cause the record to reflect its resolution thereof, particularly when the dispute is called to the court's attention." United States v. Sherbak, 950 F.2d 1095, 1098 (5th Cir. 1992) (quoting United States v. Warters, 885 F.2d 1266, 1271-72 (5th Cir. 1989)). We vacate Cantu-Cantu's sentence and remand to allow the district court to enter the findings of fact required by Fed. R. Crim. P. 32(c)(3)(D).

2.  Alfredo Garcia

Alfredo Garcia raises three objections to his sentence. First, Alfredo Garcia contends that the district court failed to make a factual finding required by Fed. R. 32(c)(3)(D) concerning one of his objections to the PSI report. Second, Garcia contends that the district court did not comply with U.S. Sentencing Guideline § 6A1.3(b) by failing to notify the parties of its

tentative findings before making final findings of fact.  Finally, Alfredo Garcia contends that the district court erred in basing Garcia's sentence on his alleged participation in the January and February shipments, with no credible evidence of his participation.

At the conclusion of the evidence at the sentencing hearing, the district court orally made the following factual findings:

> "the information contained in the presentence report, paragraphs objected to, paragraphs 15 through 20, and 22, is by a preponderance of the evidence correct, and I believe it.  I further find that your objections to paragraphs 25, 30, 32, along with paragraph 46, and paragraph 60 and 61, are not well taken.  That it is clear from all the evidence before me, and the information furnished, and I find from a preponderance of the evidence that the defendant was involved with all three of the marijuana loads, and that the guidelines were appropriately applied and correct offense level was used in calculating the sentence guidelines range."

Garcia contends that these factual findings were inadequate, because the district court failed to make a specific factual findings in response to paragraph 17 of the PSI report, which stated that Garcia had received $5,000.00 for his part in the storage and loading of marijuana.  Garcia objected to this paragraph of the report and supported this objection with testimony from his wife that her husband never suddenly acquired large sums of money in March 1990.  The district court found that her testimony and that of Alfredo Garcia's daughter, Belinda Reyes, was inconsistent and less than candid.

The district court adopted all of the findings contained in paragraphs 15 through 20 of the PSI report, stating that they were "by a preponderance of the evidence correct and I believe it." This adoption of the PSI's findings indicates that the court "at

least implicitly, weighed the positions of then probation department and the defense and credited the probation department's determination of the facts." United States v. Sherbak, 950 F.2d 1095, 1099 (5th Cir. 1992). "Rule 32 does not require a catechismic regurgitation of each fact determined and each fact rejected when they are determinable from a [Presentence Report] that the court has adopted by reference." Id. Having adopted all of the PSI report's findings on the record, the district court adequately complied with Rule 32.

Alfredo Garcia also contends that the district court failed to comply with U.S.S.G. § 6A1.3(b) by failing to provide Garcia with tentative findings sufficient to allow objections. This contention is frivolous. Garcia's counsel received the PSI report a month before the sentencing hearing. Garcia raised numerous objections to the PSI report at that hearing and presented the testimony of two witnesses to support those objections. After cross-examination of these witnesses, the court made specific oral findings rejecting Garcia's objections to the PSI report and then asked Garcia and Garcia's counsel if they had any further comments. Neither Garcia nor his counsel made any further objections or requested a continuance. These procedures amply satisfy the requirements of § 6A1.3.

We have held that the district court is not obliged to furnish his tentative factual findings before a sentencing hearing where, as here, the district court simply adopts the PSI report. United States v. Mueller, 902 F.2d 336, 347 (5th Cir. 1990). Garcia had

the PSI report at least ten days before the sentencing hearing. Fed. R. Crim. P. 32(c)(3)(A). Mueller, 902 F.2d at 347 ("because the district court merely adopted the PSI's findings, the PSI provided Mueller with adequate notice of all the issues that the district court resolved at the sentencing hearing"). Moreover, the district court provided Garcia and his counsel with an opportunity to make further comment before sentence was imposed as required by Fed. R. Crim. P. 32(a)(1)(c). Had Garcia or his counsel been dissatisfied with the district court's findings, they could have used their right of allocution to raise further objections or request a continuance for further preparation. United States v. Mills, Slip Op. No. 91-1841, at 4073 (5th Cir. April 14, 1992). There was no violation of U.S.S.G. § 6A1.3(b).

Finally, Alfredo Garcia contends that the district court erred in finding that he had assisted in the transportation of all three loads of marijuana for the purpose of calculating his sentence. We review the district court's factual findings made in sentencing for clear error. United States v. Chavez, 947 F.2d 742, 746 (5th Cir. 1991). We find no clear error in the challenged finding.

Garcia's wife and daughter both testified at his sentencing hearing that no marijuana was stored in the white shed behind Garcia's house. Mrs. Garcia also testified that she did not believe that her husband dealt in marijuana, despite her husband's guilty plea to possessing marijuana with intent to distribute in March 1990. The district court rejected the testimony of Garcia's daughter and wife, on the basis of the witnesses' "demeanor and

candor, or lack thereof" and contradictions in the witnesses' testimony.  On the basis of testimony presented at trial, the district court found that Garcia "was involved in all three of the marijuana loads."

The district court was entitled to disbelieve Garcia's witnesses and credit the trial testimony and the information in the PSI report that Garcia played a pivotal role in all three deliveries by lending his residence as a storage site.  At trial, Ruiz Salas testified that Daniel Bautista told him that Alfredo Garcia was a participant in the January load, and Vela-Garcia testified that Alfredo Garcia helped unload marijuana in January. Vela-Garcia also testified that the conspirators used a shed behind Alfredo Garcia's house for all three loads, and that he helped with the loading of the March load.  This was ample support for sentencing based on all three loads of marijuana.

Alfredo Garcia objects that Salas's testimony is unreliable hearsay.  A sentence can rest on hearsay that has sufficient indicia of reliability.  United States v. Marshall, 910 F.2d 1241, 1244 (5th Cir. 1990).  Garcia simply contends that Salas was not trustworthy.  We cannot say, however, that the district court clearly erred in crediting Salas.

Alfredo Garcia also contends that the district court could not consider Vela-Garcia's testimony in assessing his sentence, because he was dismissed from the case before Vela-Garcia testified.  For support, Garcia cites United States v. Castellano, 882 F.2d 474 (11th Cir. 1989).  However, the Castellano opinion cited by Garcia

was vacated on petition for rehearing, and a second opinion was substituted. United States v. Castellano, 904 F.2d 1490 (11th Cir. 1990). The second Castellano opinion clarified its earlier reasoning by stating that

> "It was never the position of this panel that a sentencing court may not consider testimony from the trial of a third party as a matter of law; rather, we were of the view that a sentencing court must follow the procedural safeguards incorporated in section 6A1.3 of the guidelines--safeguards designed to protect the defendant's right to respond to information offered against him and to ensure reliability of the information under consideration."

Castellano, 904 F.2d at 1496. In short, Castellano stands for no more than the proposition that the sentencing court must comply with the procedures contained in § 6A1.3, regardless of the source of the information used to determine defendant's sentence.

Nothing in § 6A1.3 of the Sentencing Guidelines bars the use of Vela-Garcia's testimony in sentencing Alfredo Garcia, as long as that testimony had sufficient indicia of reliability. Garcia contends that Vela-Garcia was an unreliable witness, referring to evidence presented at trial that Vela-Garcia had told lies and contradicted himself. Garcia also notes that Vela-Garcia testified pursuant to a plea agreement and therefore had an incentive to testify against his co-defendants. At best, this evidence creates a credibility question for the district court to resolve. The decision to credit Vela-Garcia's testimony is not clearly erroneous. United States v. Alfaro, 919 F.2d 962, 967 (5th Cir. 1990).

In essence, Garcia contends that Vela-Garcia's information concerning his participation in the January and February loads cannot be used in assessing his sentence because he pled guilty only to possession of marijuana in March.  This contention has no merit, because the district court is not limited in its consideration to the charges of which Garcia was actually convicted.  United States v. Byrd, 898 F.2d 450, 452 (5th Cir. 1990); United States v. Taplette, 872 F.2d 101, 106 (5th Cir. 1989).

The sentence imposed on José Cantu-Cantu is VACATED, and his case is REMANDED for further findings of fact and resentencing consistent with this opinion.  The district court's judgment is AFFIRMED in all other respects.