**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 92-1545
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

ROY W. CHARROUX and HARRY J. JAMES,

Defendants-Appellants.

_____

Appeal from the United States District Court
For the Northern District of Texas
_____
(September 23, 1993)

Before EMILIO M. GARZA and DEMOSS, Circuit Judges, and ZAGEL, District Judge.[*]

EMILIO M. GARZA, Circuit Judge:

Defendants, Roy W. Charroux and Harry J. James ("Charroux and James" or "defendants"), were convicted of conspiracy, attempted tax evasion, and signing a false tax return. They now appeal their convictions and sentences, and we affirm.

**I**

James, Charroux, Susan Petr, and James McClain were all in the real estate business in Dallas.[1] James was the president and co-owner of Texas Land Holding Corporation ("Texas Land"). Charroux

_____

[*]    District Judge for the Northern District of Illinois, sitting by designation.

[1]    We present the facts in the light most favorable to the jury's verdict. All dollar amounts are approximate.

was the other co-owner and vice president of Texas Land. Petr and McClain each owned half of Petr-Avery Development Corporation ("Petr-Avery"), of which Petr was president.

After Petr met James and Charroux at a bar, they introduced her to the concept of land flips, a type of transaction where a buyer agrees to purchase a tract of land at an inflated price, in return for a share of the seller's profits on the sale. James explained to Petr that a lot of money, which he described as profits, could be made on land flips.

Thereafter, James, Charroux, McClain, and Petr engaged in several land flip transactions together. First they formed a joint venture to purchase a tract of land in Carrollton, Texas. The joint venture agreement provided that all interests, including profits, in the sale of the Carrollton property would be divided as follows: 23.33% each to James, Charroux, and Petr; 30% to McClain. Petr-Avery then purchased the property from Sweden & Smith Investment Brokers for $3.1 million and resold it on the same day to Texas Land for $4.5 million. Texas Land financed its purchase of the Carrollton acreage with a $5.2 million loan, of which the lending institution disbursed roughly $4.8 million to Dallas Title Co.[2] Dallas Title, which oversaw the sale to Texas Land, then disbursed the $4.8 million as instructed by Petr: $3.1 million to Sweden & Smith; $315,000 each to James, Charroux, and Petr-Avery; and $418,000 to McClain. Before the end of the year, James and

_____

[2] Most of the remainder of the loan was retained by the lender in payment of interest due.

-2-

Charroux were released from their liability on the $5.2 million loan.

A land flip involving acreage in Coppell, Texas was accomplished in a similar manner. The defendants, Petr, and McClain formed a joint venture to purchase the property, with the profits from the sale of the land to be divided between James, Charroux, Petr, and McClain. Thereafter Petr-Avery purchased the Coppell tract from James Fuller for $2.8 million and resold it on the same day to Texas Land for $4.2 million. Texas Land then sold the land to the joint venture for $4.2 million. The joint venture financed these transactions by borrowing $5 million, out of which the lender disbursed $4.5 million to Dallas Title. Dallas Title then distributed those funds according to Petr's instructions. James Fuller received $2.8 million for the property, and Petr-Avery's profits on the sale to Texas Land were divided among the joint venturers. James and Charroux each received $276,000. By the end of the year, neither defendant was liable on the joint venture's $5 million loan.

The third land flip involved property in Plano, Texas. McClain, Petr, and the defendants formed CPH Joint Venture ("CPH"), of which one half was owned by Texas Land and the other half was owned by First American Capital Corporation.[3] Petr-Avery purchased the Plano land for $16 million and resold it the same day to CPH for $18 million. CPH financed this deal by borrowing $25 million. As instructed by Petr, the lender disbursed $18 million to Petr-

_____

[3]    First American Capital was controlled by James McClain.

Avery. Petr-Avery's $2 million in profits were divided among McClain, Petr-Avery, James, and Charroux. Each of the defendants received $441,000. Before the end of the year, Texas Land withdrew from CPH Joint Venture, and James and Charroux were no longer liable on the $25 million loan.

Texas Land's withdrawal from CPH Joint Venture occurred when McClain purchased Texas Land's interest in the venture for $5 million ("the CPH buyout"). From the $5 million, Texas Land distributed $1.23 million to each defendant and $1.25 million each to McClain and Petr.

The foregoing transactions were reviewed by a number of tax advisers who were retained by James and Charroux. However, it was revealed at trial that the defendants did not disclose to their tax advisers the agreements between themselves, Petr, and McClain to divide the profits from the land transactions. The tax professionals also did not see the checks which James and Charroux received as a result of those transactions, which indicated that the funds paid were for proceeds from the sale of land. Furthermore, according to accountant Kemble White, who analyzed the land flip transactions, the closing binders did not show payments to James and Charroux as a result of the land sales. After White noticed the amounts received from the land flips in the defendants' bank records, he inquired about them and was told by the defendants' in-house accountant Samuel Buggs, on behalf of James and Charroux, that the funds were excess loan proceeds.

As a result of the foregoing transactions and the defendants' failure to report the proceeds on their income tax returns, the defendants were indicted for conspiring to defraud the United States, pursuant to 18 U.S.C. § 371 (1988), attempting to evade income taxes, in violation of 26 U.S.C. § 7201 (1988), and subscribing to false tax returns, in violation of 26 U.S.C. § 7206(1) (1988).  A jury convicted the defendants on all counts, and the district court sentenced them to 33 months in prison. James and Charroux appeal, contending that (a) the evidence presented at trial was insufficient to sustain their convictions, as it was not proved that they acted willfully; (b) the district court erred by permitting the government's summary witness to testify that the payments which they received were kickbacks; (c) the district court violated Fed. R. Crim. P. 32(c)(3)(D) by failing to make explicit findings of fact at sentencing concerning the defendants' objections to the presentence report; (d) the district court increased their sentences on the basis of an erroneous finding that they used sophisticated means to conceal their offense; and (e) the district court erroneously increased their sentences by miscalculating the tax loss which resulted from their offenses.

**II**

**A**

James and Charroux argue that the evidence presented at trial was insufficient to sustain their convictions, because the

government failed to prove that they acted willfully.[4] "In deciding the sufficiency of the evidence, we determine whether, viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, a rational jury could have found the essential elements of the offenses beyond a reasonable doubt."[5] *United States v. Pruneda-Gonzalez*, 953 F.2d 190, 193 (5th Cir.), *cert. denied*, ___ U.S. ___, 112 S.Ct. 2952, 119 L. Ed. 2d 575 (1992). "It is not necessary that the evidence exclude every rational hypothesis of innocence or be wholly inconsistent with every conclusion except guilt, provided a reasonable trier of fact could find the evidence establishes guilt beyond a reasonable doubt." *Id.* "We accept all credibility choices that tend to support the jury's verdict." *United States v. Anderson*, 933 F.2d 1261, 1274 (5th Cir. 1991). Moreover, juries are "free to choose among all reasonable constructions of the evidence." *United States v. Chaney,* 964 F.2d 437, 448 (5th Cir. 1992).

---

[4]    Willful conduct is an element of each of the substantive tax offenses of which the defendants stand convicted. *See* 26 U.S.C. §§ 7201, 7206 (1988). Also, "in order to sustain a judgment of conviction on a charge of conspiracy to violate a federal statute, the Government must prove at least the degree of criminal intent necessary for the substantive offense itself." *United States v. Feola,* 420 U.S. 671, 686, 95 S. Ct. 1255, 1265, 43 L. Ed. 2d 541 (1975); *see also United States v. Buford,* 889 F.2d 1406, 1409 n.5 (5th Cir. 1989) ("To sustain a conviction for conspiracy under [18 U.S.C. § 371] the government must prove `the requisite intent to commit the substantive offense.'").

[5]    We apply this standard of review because Charroux and James preserved their sufficiency claims by moving for a judgment of acquittal at trial. The "manifest miscarriage of justice" standard is applied where the defendant fails to preserve his or her sufficiency claim. *See United States v. Galvan,* 949 F.2d 777, 782-83 (5th Cir. 1991) (applying manifest miscarriage of justice standard because defendant failed to move for directed verdict or for judgment of acquittal).

James and Charroux contend that the government failed to prove willfulness[6] because they relied on the advice of hired tax professionals in filing their tax returns.[7] "[R]eliance on a qualified tax preparer is an affirmative defense to a charge of willful filing of a false tax return." *United States v. Wilson,* 887 F.2d 69, 73 (5th Cir. 1989). However, "[t]o avail himself of the defense, a defendant must demonstrate that he provided full information to the preparer and then filed the return without

---

[6]  Willfulness is defined as "a voluntary, intentional violation of a known legal duty." *United States v. Pomponio,* 429 U.S. 10, 12, 97 S. Ct. 22, 23, 50 L. Ed. 2d 12 (1976) (26 U.S.C. § 7206); *Cheek v. United States,* 498 U.S. 192, ___, 111 S. Ct. 604, 610, 112 L. Ed. 2d 617 (1991) (26 U.S.C. § 7201).

[7]  Samuel Buggs, the defendants' in-house accountant, had access to all of their bank records and ledgers, as well as the closing binders for the three land flips and the CPH buyout. When Buggs began preparing income tax returns for the defendants, he was uncertain about how to treat the four amounts received by each of the defendants))$315,000, $276,000, $441,000, and $1.23 million. As a result, Buggs sought assistance from a lawyer and accountant named Kemble White. Buggs provided White and his associate, Gary Moore, with the defendants' bank records, ledgers, and closing binders.
White determined that no taxable income arose from the Carrollton, Coppell, and Plano transactions. He further concluded that the proceeds of the CPH buyout should be reported as corporate income of Texas Land. The defendants thereafter filed individual income tax returns which failed to report any income from the four aforementioned transactions. Pursuant to the advice of William Bailey, of the accounting firm of Bailey, Vaught, Robertson & Co., the defendants later filed amended individual income tax returns which reported the $1.23 million from the CPH buyout as income. The amended returns did not, however, report any income from the Plano, Coppell, or Carrollton transactions.
All of the tax professionals who reviewed these transactions))Buggs, White, Moore, William Bailey, and his associates, Joel Landau and Ronald Miller))testified that the defendants never denied them any information regarding these transactions. Several of these individuals testified either that they had all the information needed to prepare an accurate tax return, or that they had no reason to believe that any information was concealed from them regarding these transactions.

-7-

having reason to believe it was incorrect." *Id.; see also United States v. Masat,* 948 F.2d 923, 930 (5th Cir. 1991) (stating that defendant must show "(i) he relied in good faith on a professional and (ii) he made complete disclosure of all the relevant facts"), *cert. denied,* ___ U.S. ___, 113 S. Ct. 108, 121 L. Ed. 2d 66 (1992).

According to James and Charroux, the "uncontroverted testimony that [the defendants] . . . fully disclose[d] all necessary information to their tax experts" establishes that they relied in good faith on those experts and therefore did not willfully violate the tax laws. We disagree.[8] On the basis of the evidence

---

[8] The defendants' sufficiency argument is unpersuasive partly because it relies upon mischaracterizations of the evidence. According to James and Charroux, accountant Kemble White testified that, in preparing the defendants' tax returns, "he had all of the relevant information `at his disposal.'" Brief for James and Charroux at 17; *see also* Reply Brief for James and Charroux at 3 (referring to "the unchallenged testimony of accountants from McDaniel & White that they had all the necessary information `at [their] disposal.'"). This is, at best, a questionable characterization of the record. The testimony to which the defendants refer is as follows:

> Q. [Mr. Zachry, counsel for James] All right, sir. So everything you determined in the course of your analysis as to the taxability of these now four amounts, including the sale of the interest, this 1.2 million dollars, you had at your disposal, correct?
>
> A. [White] I'd say so. . . . [T]here was nothing that I asked for that I didn't get.

Record on Appeal, vol. 9, at 68-69. White did not testify either that he had at his disposal all of the relevant information, or that he had all of the necessary information.

The defendants also mischaracterize the testimony of their summary witness, Jerry Stamps. According to James and Charroux, Stamps "concluded [that] the tax preparers in this case had *all the necessary information* from which to prepare an accurate tax return." Brief for James and Charroux at 20. In fact Stamps testified as follows:

> Q. [Mr. Belcher, counsel for the government] You agree that based on the evidence Mr. James and Mr. Charroux never told the return preparers, specifically Mr. White, or Mr. Landau, or Mr. Bailey, or Mr. Miller, about the 276,000, 441,000, 315,000 at the time that the returns were being prepared based on the opinion letters, correct?
>
> A. [Stamps, summary witness] Those people had the))based on the

-8-

presented at trial, the jury could have reasonably concluded that James and Charroux believed the disputed funds to be taxable income, and that they withheld information from their tax professionals which was relevant to the taxability of those funds.

The record supports the conclusion that the funds which the defendants received from the land flips were taxable profits, and that the defendants regarded them as such. Susan Petr testified that James introduced her to the idea of land flips and told her a lot of money, which he described as profits, could be made on them. Petr further testified that she engaged in land flip transactions with James, Charroux, and James McClain, involving the Carrollton, Coppell, and Plano tracts, and that the profits derived from those transactions were split up between them. McClain further testified that he, Petr, James and Charroux split up the profits from the land flip transactions. McClain also testified that James and Charroux told him they had five to seven million dollars of taxable income for the year in question. According to McClain, he discussed with James and Charroux whether they might use tax credits from an oil company McClain owned to offset some of their tax liability.

---

evidence that's been introduced during this trial and testimony, they had the documentation which would have told them that had they looked at it.

Record on Appeal, vol. 10, at 161. It is incorrect to describe this testimony as concluding that the tax professionals "had all the necessary information from which to prepare an accurate tax return." Stamps merely stated that the tax professionals were put on notice of the three dollar amounts mentioned, and not that they were provided with information which revealed the taxable nature of those payments.

The documentary evidence included an agreement between James, Charroux, and Petr-Avery Development, which provided that James and Charroux each were to receive 25% of the profits from the Plano transaction. Similar agreements relating to the other transactions were in evidence as well. Furthermore, the checks which James and Charroux received from the Carrollton transaction stated that the payments were "proceeds on sale of 26.7716 acres."

However, the defendants did not make the foregoing information available to their tax professionals. The documents which the accountants received were bank statements, ledgers, and the closing binders from the transactions. The bank statements showed that the disputed amounts were received and deposited by the defendants, but those documents revealed nothing about taxability: Samuel Buggs, the defendants' in-house accountant, admitted that the bank statements did not reveal whether a given deposit was income or not. Furthermore, Buggs testified that the disputed amounts were not referred to on the general ledgers which he prepared, and which were then provided to the other tax preparers. Accountant Kemble White testified that the closing binders "did not show proceeds going out to Mr. James and Mr. Charroux" on any of the three land sales, and that he did not see the disbursement sheets which indicated payments to James and Charroux from those transactions.

Furthermore, Buggs testified that James and Charroux never told him that the amounts they received on land sales))$276,000, $315,000, and $441,000))were shares of the profits which Petr-Avery derived from those transactions. According to White, at the time

he prepared tax returns for James and Charroux he was not made aware of any agreements entitling the defendants to shares of Petr-Avery's profits from land transactions. White testified that, when he first became aware of the payments, he suspected that they constituted excess loan proceeds. White contacted Buggs, who confirmed that the payments were in fact excess loan proceeds. According to Buggs, James and Charroux told him the funds were loan proceeds, and he conveyed that information to White.[9] Buggs admitted on cross-examination that, if the defendants believed the money was "revenue associated," they would have misled him by telling him that the funds were excess loan proceeds.

In light of all of the foregoing evidence, it is hardly undisputed))as the defendants contend))that they provided to their tax professionals all the information necessary for the preparation of accurate tax returns. The jury could reasonably have concluded that James and Charroux, knowing that the land flip revenues were taxable income, led their tax advisers to believe that those funds were nontaxable loan proceeds and withheld from their advisers the information which would have revealed the taxable character of the

---

[9] James and Charroux contend that it is irrelevant to their defense of reliance on tax professionals whether they led Kemble White to believe that the funds were excess loan proceeds. They argue that White regarded the funds as non-taxable because they were partnership funds rather than individual funds, and therefore the defendants' representation that the funds were loan proceeds did not affect White's determination of taxability. We disagree. It is undisputed that loan proceeds, i.e. borrowed money for which a taxpayer is liable, is not taxable, whereas profits are taxable. Therefore, regardless whether the defendants' representation affected White's view of the taxability of the funds, the jury was entitled to conclude that James and Charroux mischaracterized those funds, and therefore neither relied in good faith upon the advice of their tax professionals nor fully informed them of all relevant facts.

-11-

money.[10]  Consequently, the defendants' attack on the sufficiency of the evidence is without merit.

## B

James and Charroux also contend that the district court erred by permitting the government's expert summary witness, James Whitfield, to testify that the payments received by the defendants from the three land flips were "kickbacks."  The decision whether to admit expert testimony is entrusted to the sound discretion of the district court and will be reversed only for an abuse of that discretion.  *See United States v. Bryan,* 896 F.2d 68, 72 (5th Cir.) *cert. denied,* 498 U.S. 847, 111 S. Ct. 133, 112 L. Ed. 2d 101 (1990); *United States v. Masat,* 896 F.2d 88, 94 (5th Cir. 1990); *United States v. Newman,* 849 F.2d 156, 165 (5th Cir. 1988).

At trial Whitfield gave the following testimony:

Q.  [Mr. Belcher, counsel for the government]  Mr. Whitfield, let me ask you first about the first three transactions, what have been referred to here by Mr. McClain and Ms. Petr as land flips.  Did the monies that Mr. James and Mr. Charroux each receive[d] out of those three land flips in the amount of [$]315,000[,] [$]276,000 and $441,000 apiece, constitute income for Federal income tax purposes?

A.  [Whitfield]  To them, yes.

Q.  How would you classify them for Federal income tax purposes based on the evidence that's been presented here in Court?

---

[10]     Counsel for James and Charroux assert that James Whitfield, the government's summary expert witness, "acknowledged that he found no attempt by [the defendants] to conceal the transactions and monies at issue in the tax returns."  Again counsel for the defendants mischaracterize the testimony given at trial.  Whitfield was not asked whether he found any attempt by the defendants to conceal the land flips.  He was merely asked whether depositing the disputed funds into accounts bearing Harry James' social security number was "somehow an effort to secret these funds," and he responded in the negative.  *See* Record on Appeal, vol. 8, at 49-50.

-12-

A.   As kickbacks.

Record on Appeal, vol. 8, at 22.  The defendants objected to this testimony, and the district court overruled the objection. Whitfield referred to kickbacks several more times over the defendants' objections.

James and Charroux contend that Whitfield was improperly permitted to testify about their intent, in violation of Fed. R. Evid. 704(b).  According to the defendants, "[t]he element of improper intent . . . is present in both the layman's definition of the term [kickback] . . . [and] the legal definition accepted in the Fifth Circuit."[11]  Therefore, they argue, "[i]n order to conclude that [the defendants] were engaged in a kickback scheme, the government witness necessarily would have had to conclude that the [defendants] had the requisite mental state for engaging in such illegal activity. . . . To state that a party received a kickback is thus to testify that he possessed a culpable mental state."  We disagree.

As we understand Whitfield's testimony, he did not intend, by using the term kickback, to suggest anything about the defendants' intent.  On cross-examination counsel for the defendants elicited from Whitfield his definition of the term.[12]  It was Whitfield's

_____

[11]   *See United States v. Porter,* 591 F.2d 1048, 1054 (5th Cir. 1979) (interpreting 42 U.S.C. § 1395nn(b)(1), which prohibited soliciting, offering, or receiving kickbacks).

[12]   Q.  [Mr. Zachry, counsel for James]  Define kickback for me.

A.  [Whitfield]  Kickback?

-13-

understanding that a kickback occurred when money was transferred from one party to another and some of the money was passed back to the original possessor. Whitfield did not define kickbacks as involving any improper intent, and specifically admitted that he did not know whether they were illegal.[13] Consequently, we disagree

---

Q. Yes, just a general definition. You've used the term, the Government uses it in the Indictment. I'd like to know what you mean by it.

A. In my mind it's))it's the original possessor of the funds pays to a successor possessor, and the second one passes money back to the original possessor of the funds.

Q. In other words, if I paid you money, and you pay me part of that money back that's a kickback? Is that what you're saying? I want closer.

A. If it is a))if for some reason you purchase))if I bought an asset or bought services from this other person, and in return for getting that contract or that deal, then we agreed that I'm going to pass funds back to you, sorry))

Q. That's okay. So there's an agreement there for to))you pay me money, okay, and you're going to do something for me, right. Is that what you're saying?

A. Right.

Q. Because you're going to do something for me I'm going to give you a portion of that money back, right?

A. Right.

*   *   *

Q. All right, sir. Are all kickbacks illegal?

*   *   *

A. I don't know.
Record on Appeal, vol. 8, at 67-68.

[13] James and Charroux contend that it is presumed that the jury, as laypeople, understood the layperson's definition of the term kickback. Furthermore, according to the defendants, the

-14-

with the defendants' argument that Whitfield implicitly testified that they acted with wrongful intent. Whitfield merely used the term kickback in a descriptive fashion, to point out how money changed hands in the land flip transactions.[14]

James and Charroux also contend that Whitfield's testimony should not have been permitted because his conclusion))that the payments were kickbacks))was not supported by any evidence in the record. According to the defendants, the evidence showed only that they received excess loan proceeds for the purpose of developing the Carrollton, Coppell, and Plano tracts. This argument is not supported by the record. As we have already discussed, *see supra* Part II.A., substantial evidence supports the conclusion that the funds which the defendants received represented profits. The testimony of James McClain reveals that James and Charroux purchased land at inflated prices and in return for doing so received a share of the sellers' profits. That evidence certainly supports the conclusion that the payments were kickbacks, as

---

layperson's definition is found in the American Heritage Dictionary and describes kickbacks as being "by confidential arrangement or coercion." However, the defendants cite no authority for the proposition that we should presume the jury to have understood Whitfield's testimony in terms of the American Heritage Dictionary definition of the term kickback, and we are not inclined to do so where Whitfield expressly stated that he had a different understanding of that word.

[14]    James and Charroux also contend that Whitfield testified to a legal conclusion which was outside his area of expertise, and that Whitfield invaded the province of the jury as fact finder. Because it is clear from the defendants' brief that these arguments are premised on the assumption that Whitfield testified about the defendants' intent))a proposition which we have already rejected))they are without merit.

-15-

defined by Whitfield. Furthermore, the defendants' summary witness, Jerry Stamps, admitted that he had not seen a single document which stated that excess loan proceeds were disbursed to James and Charroux. According to Stamps, it was Samuel Buggs and Kemble White who characterized the funds as excess loan proceeds, and the testimony of White and Buggs reveals that they received that information from James and Charroux. Finally, James McClain testified that James and Charroux never used any of the funds for development purposes, and Susan Petr testified that the defendants spent the money for clothes and other personal uses. Whitfield's testimony was supported by the evidence at trial. The district court therefore did not abuse its discretion by permitting Whitfield to testify that the payments received by James and Charroux were kickbacks.

## C

The defendants further contend that the district court violated Fed. R. Crim. P. 32(c)(3)(D) by failing to make specific findings regarding their objections to factual inaccuracies in their presentence reports (PSR's).[15] James and Charroux filed written objections to several aspects of their PSR's and raised

---

[15] Fed. R. Crim. P. 32(c)(3)(D) provides:

> If the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing.

further objections at the sentencing hearing.[16]  In overruling those

objections, the district court made the following statements:

> As to the objections to the Pre-Sentence Report, and this goes to both Defendants, I'm going to overrule the objections. . . .
>
> I overrule))reject the argument that there's no evidence that the tax loss occurred on the last filing. True, the amended return lowered the tax loss, but there were errors in that return.  And there was still a substantial loss to the government on that filing.
>
> Then third, as to the amount of the tax loss, I think the Probation Department has correctly concluded that the total loss, 2.9 million approximately, should be the basis of the guideline calculation.  There is a conspiracy count.  There was a conviction on conspiracy, and I think it's proper to treat it on that basis. . . .
>
> [A]s to the sophisticated means, I do overrule that objection.  The means are sophisticated within the meaning of the guidelines.  I don't have to have an offshore tax problem in order to have a sophisticated means.  And based on the evidence heard at trial, I would reject that objection.

> \*   \*   \*

> As to the objections to paragraph 8, 25, another objection to 25, I would overrule those based on the reasons that I've stated, and based on the evidence that was heard during trial.

> \*   \*   \*

---

[16]     The defendants objected to the following matters:  (1) the statement in paragraph 8 of the PSR that "the defendants concealed income from land flips"; (2) the suggestion in paragraph 18 that the defendants filed amended tax returns only because the government initiated an investigation of James McClain; (3) the calculation in paragraph 19 of the amount of money the defendants received from the three land flips and the CPH buyout; (4) statements in paragraphs 20 and 25 regarding the amount of income that the defendants failed to report and the amount of tax loss that they caused to the United States; and (5) the suggestion in paragraph 26 that the defendants used sophisticated means in the course of their offense.  The PSR's of the two defendants are identical in all respects pertinent to those objections.  The defendants' remaining objections dealt with legal rather than factual matters, and therefore are not relevant to the defendants' Rule 32(c)(3)(D) argument.

And then as to James' objections, the government's objections were exactly the same; first one accepted, the second one rejected.[17]

And as to the specific objections to paragraph 8, paragraph 18, paragraph 19, paragraph 20, paragraph 25, 26, 39, those are overruled for the reasons stated here, and also based on the evidence presented during trial.

Record on Appeal, vol. 12, at 24-26.

James and Charroux argue that this explanation of the district court's ruling was insufficient to satisfy Rule 32(c)(3)(D) because the district court "cannot simply adopt the findings of the Pre-Sentence Report in order to support a sentencing decision."  The defendants' argument is meritless.  In *United States v. Garcia,* 963 F.2d 693 (5th Cir.), *cert. denied,* ___ U.S. ___, 113 S. Ct. 388, 121 L. Ed. 2d 296 (1992), the district court rejected the defendants' objections with less explanation than the district court provided in this case:

[T]he information contained in the presentence report, paragraphs objected to, paragraphs 15 through 20, and 22, is by a preponderance of the evidence correct, and I believe it.  I further find that your objections to paragraphs 25, 30, 32, along with paragraph 46, and paragraph 60 and 61, are not well taken.  That it is clear from all the evidence before me, and the information furnished, and I find from a preponderance of the evidence that the defendant was involved with all three of the marijuana loads, and that the guidelines were appropriately applied and correct offense level was used in calculating the sentence guidelines range.

*Id.* at 706.  However, we held that "the district court adequately complied with Rule 32" because the "adoption of the [PSR's] findings indicates that the court `at least implicitly, weighed the

_____

[17]     The district court indicated that the government's second objection was overruled for the reason stated by the probation department in its response to the government's objections.

-18-

positions of [the] probation department and the defense and credited the probation department's determination of the facts.'" *Id.* (quoting *United States v. Sherbak,* 950 F.2d 1095, 1099 (5th Cir. 1992)). No less can be said here. The district court specifically referred to each disputed issue and indicated that the defendants' objections to the factual findings in the PSR were without merit. In several instances the district court provided more detail regarding the factors which it considered in resolving the factual disputes. This was enough to satisfy Rule 32(c)(3)(D). As we noted in *Garcia,* "`Rule 32 does not require a catechismic regurgitation of each fact determined and each fact rejected when they are determinable from a [PSR] that the court has adopted by reference." *Id.* at 706-07 (quoting *Sherbak*). In light of *Garcia,* we are convinced that the defendants' Rule 32 argument is without merit. *Cf. United States v. Hooten,* 942 F.2d 878, 882 (5th Cir. 1991) (remanding for further factual findings where "district court never addressed the question of who owned the pistol").

**D**

The defendants also contend that the district court erred in sentencing them, by applying a sophisticated means enhancement under § 2T1.3(b)(2) of the Sentencing Guidelines. *See* United States Sentencing Commission, *Guidelines Manual*, § 2T1.3(b)(2) (Nov. 1992) ("If sophisticated means were used to impede discovery of the nature or extent of the offense, increase by 2 levels."). The defendants argue that they are not knowledgeable or sophisticated with regard to the tax laws, and furthermore their

methods were not so sophisticated that the IRS could not have easily discovered the sources of the disputed funds. We review for clear error the district court's factual finding that the defendants used sophisticated means to conceal their offenses. *See United States v. Shell,* 972 F.2d 548, 550 (5th Cir. 1992) ("For purposes of the [sentencing] guidelines, the sentencing court's findings of fact are reviewed under the `clearly erroneous standard.'"); *United States v. Becker,* 965 F.2d 383, 390 (7th Cir. 1992) (applying clearly erroneous standard to finding of sophisticated means), *cert. denied,* ___ U.S. ___, 113 S. Ct. 1411, 122 L. Ed. 2d 783 (1993). We will not find a district court's ruling to be clearly erroneous unless we are left with the definite and firm conviction that a mistake has been committed. *United States v. Mitchell*, 964 F.2d 454, 457-58 (5th Cir. 1992).

We find no clear error here. Although the evidence does not indicate that either James or Charroux were tax experts, it does support the conclusion that they structured elaborate transactions to hide their revenues. James McClain described one advantage of land flips, such as the ones he engaged in with James and Charroux, as follows: "What happens was you bought a piece of property for an inflated price and then everybody involved took part of the proceeds and the closing statement, as well as the documents to the savings and loan, showed that you paid that much for the piece of property. Therefore, the regulators didn't realize where the money was really going, . . . [who] was receiving it, or what you were using the funds for." The evidence also supports the conclusion

-20-

that James and Charroux sought the advice of various tax professionals in order to lend the appearance of legitimacy to their dealings, while withholding from those professionals the information which would have permitted them to determine correctly the taxability of the land flip revenues. *See supra* Part II.A. As in *United States v. Jagim,* 978 F.2d 1032 (8th Cir. 1992), *cert. denied,* ___ U.S. ___, 113 S. Ct. 2447, 124 L. Ed. 2d 664 (1993), upon which the defendants rely, this was not merely a case in which "an individual taxpayer completed his individual 1040 form with false information to avoid paying some of his federal taxes." *See id.* at 1042. The district court's finding of sophisticated means was not clearly erroneous.[18]

**E**

Lastly, James and Charroux argue that they were improperly sentenced because the district court miscalculated the tax loss which resulted from their offenses. The district court arrived at a figure of $2.9 million by aggregating all tax liability of either defendant on any funds received from the four transactions at issue here. Each defendant was sentenced on the basis of the total tax loss caused by both defendants. Based on the tax loss of $2.9

---

[18] We are not persuaded by the defendants' reference to "[t]he ease with which the I.R.S. could have discovered the allegedly `hidden' income." Agent Whitfield's testimony, on which the defendants rely, does not support the proposition that the sources of the funds were easily discoverable. Whitfield merely testified that he would have asked about the source of the funds if he had seen the defendants' bank records in the course of an audit. Furthermore, other evidence supported the conclusion that the defendants' means were sophisticated, even if they were not fail-safe.

million, the district court set the defendants' base offense level at 16 and sentenced both defendants to 33 months in prison.[19]  On appeal the defendants present several arguments contesting the correctness of the $2.9 million tax loss figure.  None of these has merit.

The defendants first argue that the district court erred by including in the tax loss the tax due on the amounts which they received in connection with the Coppell and Carrollton transactions))$276,000 and $315,000.  They contend that these sums represented loans for which they were liable, and that the money therefore was not taxable.  Whether these amounts represented loans to the defendants is a factual question, and the district court's resolution of that issue is reviewed only for clear error.  *See Shell,* 972 F.2d at 550.  As our earlier discussions should make clear, substantial evidence supports the conclusion that these payments were not loans but kickbacks.  *See supra* Parts II.A. & B.  Therefore the district court did not clearly err by including as tax loss the tax due on the proceeds of the Coppell and Carrollton transactions.

---

[19]    The PSR assigned the defendants a base offense level of 16 based on a tax loss of $1,044,643.  *See* United States Sentencing Commission, *Guidelines Manual*, § 2T4.1(K) (1988) (providing base offense level of 16 where tax loss was between $1,000,001 and $2,000,000).  Although the district court later adopted the higher tax loss figure of $2.9 million, it is apparent that the district court failed to adopt a higher base offense level, as directed by the guidelines, *see id.* § 2T4.1(L) (providing base offense level of 17 in cases where tax loss was between $2,000,000 and $5,000,000), because the district court stated at the sentencing hearing that the guideline range for the defendants was 27-33 months, which was the range arrived at by the PSR on the basis of the $1,044,643 tax loss figure and the base offense level of 16.

The defendants also argue that the district court should not have counted the tax owed on the $441,000 which each of them received from the Plano transaction. According to the defendants, that tax liability should not be considered because they did not attempt to evade those taxes. They contend, as they did at trial, that their failure to report the $441,000 as income resulted entirely from the errors of their tax advisors, so that they had no wrongful intent. Defendants are merely attempting to retry in this Court the issue of reliance on tax professionals which was decided against them at trial. As we have already stated, *see supra* Part II.A., ample evidence supports the conclusion that the defendants did not make full disclosure to their tax advisers, and did not rely in good faith on their advice. Consequently, the district court's inclusion in tax loss of the tax due on the $441,000 was not clearly erroneous.[20]

Lastly, the defendants contend that the district court erred by holding each of them responsible not only for the tax loss which he caused, but also for the tax loss which the other caused. James and Charroux argue that the definition of "tax loss" contained in

_____

[20] The defendants raise a similar argument regarding the tax due on the funds which they derived from the CPH buyout. However, we need not decide whether any error was committed with respect to these funds, since any error would be harmless. *See* Fed. R. Crim. P. 52(a). Even if the taxes due on the $1.23 million were excluded from the tax loss amount, that amount would still exceed $1,000,000. Therefore, the defendants' base offense level would still be 16, *see* U.S.S.G. § 2T4.1(K) (Nov. 1988) (providing base offense level of 16 where tax loss was between $1,000,001 and $2,000,000), and their sentencing guideline range would still be 27-33 months. Because any error would have no effect on the defendants' sentences, it would be harmless.

U.S.S.G. § 2T1.3))which refers to "the taxpayer" and not to multiple tax payers[21]))demonstrates that the sentencing guidelines do not contemplate the calculation of tax loss on the basis of co-conspirators' conduct.[22] We are not inclined to extrapolate such a momentous proposition from the fact that § 2T1.3 refers to the taxpayer in the singular, particularly when other guidelines clearly require the contrary result.

§ 1B1.3 of the sentencing guidelines provides that a defendant's base offense level is determined on the basis of:

> all acts and omissions committed or aided and abetted by the defendant, *or for which the defendant would be otherwise accountable*, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense . . . .

United States Sentencing Commission, *Guidelines Manual*, § 1B1.3(a)(1) (1988).[23] "Conduct `for which the defendant would be otherwise accountable' . . . includes conduct of others in furtherance of the execution of [a] jointly-undertaken criminal

---

[21] *See* U.S.S.G. § 2T1.3(a) (1992) ("If the taxpayer is a corporation, use 34 percent in lieu of 28 percent [in calculating tax loss].").

[22] In support of their argument, the defendants cite cases which support the proposition that a joint venturer owes taxes on joint venture revenues only to the extent that the revenues are earned from the portion or percentage of the joint venture which the joint venturer owns. *See Melbourne Ranches, Inc. v. Commissioner,* T.C. Memo 1971-264, 30 CCH TCM 1132 (1971). The defendants' sentences are governed by the sentencing guidelines, and not by civil tax cases.

[23] The district court applied this version of § 1B1.3 in sentencing James and Charroux. A different version is now in effect.

activity that was reasonably foreseeable by the defendant." U.S.S.G. § 1B1.3, comment. (n.1). Because the record clearly demonstrates that each of the defendants' conduct was reasonably foreseeable to the other defendant, § 1B1.3 supports the district court's decision to hold each defendant responsible not only for the tax loss which he caused, but also for the tax loss caused by his co-defendant.[24]

## III

For the foregoing reasons, we **AFFIRM**.

---

[24] We have not previously applied § 1B1.3 to aggregate the tax losses of co-conspirators. However, at least one district court has applied § 1B1.3 to an analogous situation. *See United States v. Kaufman,* 800 F. Supp. 648, 652 (N.D.Ind. 1992) ("U.S.S.G. § 1B1.3(a) requires the court to consider all unreported income, regardless of whose pocket into which it went."). Furthermore, § 1B1.3 has been applied to other criminal tax cases as well. Judge Easterbrook, of the Seventh Circuit, recently wrote that "[t]ax offenses, like embezzlements and drug crimes, fall within the rule that relevant conduct includes the whole scheme." *United States v. Harvey,* 996 F.2d 919, 922 (7th Cir. 1993) (referring to U.S.S.G. §§ 1B1.3, 2T1.3); see also *United States v. Meek,* 998 F.2d 776, ___ (10th Cir. 1993); *United States v. Brimberry,* 961 F.2d 1286, 1292 (7th Cir. 1992). Furthermore, guideline section 2T1.3, which governed the computation of tax loss in this case, specifically directs our attention to § 1B1.3. *See* U.S.S.G. § 2T1.3, comment. (n.3) ("In determining the total tax loss attributable to the offense (see § 1B1.3(a)(2)), all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated.").