**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 20, 2009

Charles R. Fulbruge III
Clerk

No. 08-30567

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

SAMUEL H. THOMAS,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Louisiana, Monroe Division
USDC No. 3:06CR30031-01

Before JONES, Chief Judge, ELROD, Circuit Judge, and GUIROLA, District Judge.[*]

PER CURIAM:[**]

Following a jury trial, defendant-appellant Samuel H. Thomas was convicted of two counts of filing a false tax return and one count of tax evasion. He timely appealed both his convictions and the restitution ordered. We AFFIRM.

---

[*] District Judge, Southern District of Mississippi, sitting by designation.

[**] Pursuant to Fifth Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Fifth Circuit Rule 47.5.4.

## I. BACKGROUND

Samuel Thomas appeals his conviction on two counts of filing a false tax return, 26 U.S.C. § 7206(1), and one count of tax evasion, 26 U.S.C. § 7201. Thomas, a self-described country lawyer in Louisiana, employed an assistant, Matra Hamilton, and an accountant, Louis Bradley, to manage his accounts. The false tax return convictions concern his 1999 corporate income tax return, which reported a gross income of $436,850 (as against actual gross income of $1,231,681), and his 1999 individual tax return, which reported a taxable income of $66,575 despite purchases and disbursements of approximately $310,000 that year. Thomas concedes that his books were not monuments to organization, but denies that his behavior was criminal.

The evasion conviction stems from Thomas's failure to make a particular disclosure during negotiations with the Internal Revenue Service (IRS) regarding overdue tax liability in excess of $407,000. The negotiations were initiated on grounds of "doubt as to collectibility," i.e., Thomas's inability to pay. At the time, Thomas's law firm was engaged in litigating and mediating a case ("the *Wiley* matter") it had taken on a contingency fee basis. Thomas did not disclose in his negotiations with the IRS the possibility that he might receive attorney's fees in the case; following settlement, he received $557,193 for his work on *Wiley*.

Bradley, the accountant, was tried with Thomas. Both were acquitted of conspiracy to file a false tax return, and Bradley was also acquitted on two counts of aiding and assisting and making and subscribing a false tax return. The district court denied Thomas's motion for a judgment of acquittal.

## II. DISCUSSION

On appeal, Thomas challenges (1) the sufficiency of the evidence for all three convictions, (2) the propriety of the deliberate ignorance jury instruction,

and (3) the restitution ordered.[1]  He conceded the third issue at oral argument; accordingly, we consider only the first two.

A. *Sufficiency of the Evidence*

Thomas timely moved for a judgment of acquittal, thus preserving his challenge to the sufficiency of the evidence.  Accordingly, we review the denial of that motion *de novo*.  *United States v. Harris*, 566 F.3d 422, 435 (5th Cir. 2009). "Under this standard, we determine whether a reasonable jury could find that the evidence establishes the guilt of the defendant beyond a reasonable doubt." *United States v. Williams*, 507 F.3d 905, 908 (5th Cir. 2007).  We view the evidence in the light most favorable to the verdict and draw all reasonable inferences and credibility choices from the evidence to support the verdict. *Harris*, 566 F.3d at 435.

1. Two counts of making and subscribing a false tax return

Thomas was convicted of making and subscribing a false tax return, 26 U.S.C. § 7206(1).[2]  He claims that Hamilton, his assistant, dealt with Bradley, and that he was not involved with the preparation of the 1999 corporate and individual returns.  Thomas admits he signed both the returns, but maintains he did so without reading them and that he hired Hamilton and Bradley so that

---

[1] Thomas also asserted an inconsistent verdicts argument below, but does not raise it on appeal except to allude to it in a couple pages of his reply brief.  It is unclear whether this claim is even recognized in this circuit, *see United States v. Agofsky*, 458 F.3d 369, 375 (5th Cir. 2006) (quoting *United States v. Powell*, 469 U.S. 57, 69 (1984)), but in any event we deem it waived here.  *See United States v. Jackson*, 426 F.3d 301, 304 n.2 (5th Cir. 2005) (claims raised on appeal for the first time in a reply brief are waived); *United States v. Thames*, 214 F.3d 608, 612 n.3 (5th Cir. 2000) (inadequately briefed claims are waived).

[2] The elements of the offense are that: (1) a false return was made and signed, (2) the false entry was material, (3) the return contained a written declaration that it was made under the penalties of perjury, (4) the defendant did not believe that the return was true and correct when signed, and (5) that the defendant signed willfully and with specific intent to violate the law.  *United States v. Bishop*, 264 F.3d 535, 552 (5th Cir. 2001).

he did not have to worry about his taxes and could avoid liability.[3] The basis of his sufficiency challenge is that any errors were Bradley's fault, and that any fault attributable to Thomas was mere negligence.

Considering the significant disparity between the income Thomas reported on his corporate income tax return and his law practice's actual income, and viewing the evidence in the light most favorable to the verdict, the jury was entitled to disbelieve this excuse. In 1999, Thomas's law practice had $1,231,681 in gross income versus the $436,850 he reported. The fees Thomas received from the *Wiley* case alone exceeded the entire amount of corporate gross income he reported that year. (Thomas received checks for his work in the *Wiley* matter totaling approximately $647,193 in 1999.) In addition, as discussed *supra* at note 3, Bradley testified that he sent drafts of the two returns to Thomas's office in February 2000 and that Hamilton called and stated that Thomas's income was too high on the draft. Bradley testified that he then made some questionable changes to the return, reducing his income and increasing his expenses. He further testified (though Thomas disputed) that Thomas reviewed the tax forms before Bradley submitted them. On this record, the jury was entitled to credit Bradley's version of events over Thomas's.

---

[3] The jury was instructed on the defense of good faith reliance on a tax professional. The defense requires (1) full disclosure and (2) good faith reliance. *See, e.g.*, *United States v. Charroux*, 3 F.3d 827, 831 (5th Cir. 1993). On appeal, Thomas only alludes to this defense, and not until his reply brief. The Government concedes that Thomas provided Bradley with all of his bank statements, but argues that this disclosure was nevertheless incomplete because Thomas did not provide explanations for the various deposits and expenditures.

One specific incident illuminates, and provides support for, the jury's decision to find that Thomas was not truthful with Bradley. Bradley sent over a draft of the 1999 return in February 2000. Hamilton, Thomas's assistant, told Bradley that the corporate income was too high and should be adjusted downward. Bradley complied. The jury could have reasonably believed that this instruction did not really come from Hamilton, but from Thomas. If the jury so concluded, it would have meant that Thomas failed to fully disclose financial information, which would undermine the first prong of this defense. *See id.*

Regarding Thomas's individual return, the disparity in gross individual income reported is striking. He reported $66,575 in personal income in 1999, but spent approximately $310,000 on personal expenses that year, including expensive gifts for his wife, a $53,000 Lexus for his wife,[4] $50,000 to buy a certificate of deposit and fund a bank account for his wife, gifts to relatives exceeding $22,000, a donation to his church for $25,000, a $5,000 campaign contribution, and other disbursements, including purchases of jewelry, furniture, and electronics.

After reviewing evidence of these purchases and the circumstances of Thomas's filing his tax return, the jury was entitled to reject Thompson's claim that he simply never looked at his returns before signing them. Because the jury apparently concluded that Thompson was at a minimum aware of the gross income he reported, the jury could also have been justified in concluding that Thompson knew (or was deliberately ignorant) that this figure was far too low considering corporate revenue and personal expenditures.

In sum, a rational jury could have concluded beyond a reasonable doubt that Thomas knew how much money his business was making and that he misreported that figure willfully and with specific intent to violate the law.

2. Evasion count[5]

a. *Relevant facts*

In 1994, Thomas pled guilty to two counts of failing timely to file several tax returns. On December 7, 1995, he was released from prison and served the

---

[4] Thomas claims that the car was a business expense because his wife helped out with his firm. Thomas's and his wife's joint individual return lists Thomas's wife's occupation as housewife, not as a firm employee. Even without this purchase, Thomas obviously spent more on personal items than he reported in individual gross income.

[5] 26 U.S.C. § 7201. The elements of evasion are (1) willfulness, (2) the existence of a tax deficiency, and (3) an affirmative act constituting an evasion or an attempted evasion of the tax. *United States v. Nolen*, 472 F.3d 362, 377 (5th Cir. 2006).

remainder of his sentence in a halfway house. He still owed the IRS $407,000 for unpaid taxes. At some point, he took on the *Wiley* matter mentioned above, a personal injury case in which he represented Draina Wiley in a suit against Traditional Trucking (his license to practice law had not yet been suspended). Thomas engaged the help of three other lawyers, and the four of them entered a contingency fee agreement with Wiley for forty percent of any recovery, which the lawyers agreed to divide evenly.

The suit was filed on November 5, 1996, and in May 1997, Producers Feed Company was added as another defendant. On August 20, 1997, Traditional Trucking agreed to a $900,000 settlement, but at the last minute, attempted to add an additional term that Producers Feed Company also be released from liability. Wiley refused and litigated the settlement agreement. On November 21, 1997, the defendant's suspension from the practice of law began.

On November 23, 1997, Thomas wrote the IRS to explain that his bar license was being suspended and that he would not be able to make the payments on his outstanding $407,000 tax liability. He claimed that friends were willing to lend him $43,000, but only if that would extinguish the entire liability. This letter began the offer in compromise (OIC) process. On January 14, 1998, a complying OIC was submitted, which included the required Form 656. An additional OIC was submitted on September 10, 1998, with an addendum on February 25, 1999. As the reason for submitting the OIC, each form has checked "doubt as to collectibility," i.e. insufficient assets to pay the outstanding tax liability of $407,000.

An OIC also requires forms 433-A and 433-B, information statements for individuals and businesses, respectively. Thomas submitted his 433-A dated April 8, 1998, which he updated on September 23, 1998. Thomas never signed this form; Bradley did. The form asks about anticipated increases in income, and the "no" box is checked. The form also inquires about court proceedings.

The "yes" box is checked, but the IRS agent responsible testified that the only lawsuit disclosed to him was a suit between Thomas and some family members over an estate—not the *Wiley* matter.

Thomas's 433-B is dated November 25, 1997, and was updated December 31, 1998. He signed this form, but it is not clear who updated it. (The updates are penciled-in, and the signature block is initialed.) The form asks for "additional financial information regarding financial condition." Thomas merely states that the firm is current on its tax liabilities.

On August 25, 1998, Wiley prevailed on summary judgment. This ruling meant the $900,000 settlement agreement with Traditional Trucking, if upheld on appeal, was enforceable and that Thomas would receive a quarter of the forty-percent contingency fee, or $90,000.[6] However, none of the documents Thomas submitted after August 25, 1998, included any reference to this potential, and substantial, increase in income. The relevant documents are: (1) the updated 433-B, dated December 31, 1998, (2) the updated 433-A, dated September 23, 1998, (3) the amended OIC, filed September 10, 1998, and (4) the addendum to the OIC, filed February 25, 1999.

Thomas also never disclosed the possibility of settlement with Producers Feed Company. On February 11, 1999, Producers Feed Company offered to settle for $1.5 million, which was rejected. Nevertheless, the OIC addendum, dated February 25, 1999, did not mention a possible increase in income. The case went to mediation, and on March 31, 1999, the defendant received $557,193 in attorney's fees from a settlement with Producers Feed Company.

Thomas neither updated his OIC or his 433 forms to reflect the settlements, nor informed the IRS of the settlements in any way. On April 27, 1999, the IRS, unaware of the settlement, accepted Thomas's offer of

---

[6] It took approximately one year for Thomas to receive payment. The check he received was dated August 31, 1999.

7

compromise. The compromise agreement states, "Based upon the taxpayer's projected future income, the service [IRS] believes collection of the remaining liability is in doubt."

On May 4, 1999, Thomas borrowed money from Cross Keys bank to pay the $43,000. Just a month earlier he was issued a check for over $550,000 from the Producers Feed Company settlement.

On December 2, 2002, Thomas answered questions from an IRS agent in a letter. Among these answers, Thomas denied having any involvement in the *Wiley* matter. According to the Government, evidence of Thomas's involvement in the suit consisted of (1) paying investigators, (2) representing to Traditional Trucking in writing that he represented Wiley, and (3) writing to Producers Feed Company's counsel regarding a prior meeting and a potential future settlement. All of this allegedly occurred before Thomas's license was suspended on November 21, 1997—two days before he first contacted the IRS regarding an OIC. Thomas also corresponded with one of Wiley's other attorneys on December 18, 1998, and complimented him on his handling of the case.

In these responses, Thomas also claimed that he provided Bradley with the information for the 433-A. In addition, he claimed that the fees from the *Wiley* case were reflected in his returns. Thomas wrote that he answered all questions truthfully according to his knowledge at the time.

### b. *Discussion*

Thomas's argument on the evasion conviction is essentially two-fold. First, he did not sign the 433-A and therefore cannot be liable for any of his attorney's misrepresentations. Second, he claims that he did not know the status of the *Wiley* case and honestly doubted its outcome. In essence, he claims that he had no duty to update his initial, truthful disclosures.

The Government disputes these claims. It maintains that even if the forms themselves were truthful, the disclosures in the December 2, 2002, letter

were untruthful, and therefore acts of evasion. The Government further contends that obtaining the bank loan was an act of evasion intended to conceal Thomas's recent receipt of substantial assets. Finally, the Government argues that the false tax returns themselves could have been an attempt to hide assets to avoid paying the outstanding $407,000 liability.[7]

The evidence adduced at trial was substantial. Based on the record evidence, including that recounted above—namely, Thomas's failure to disclose the *Wiley* matter in his 433-A and 433-B, including in the updated versions of these documents submitted after his client in *Wiley* prevailed in her fight to enforce a prior settlement against one party, and after the other party proposed a settlement that would yield Thomas hundreds of thousands of dollars; the OIC addendum Thomas submitted after these developments that made no mention of them; the bank loan he secured, giving the impression that he was short on cash; and his denial of involvement with the *Wiley* matter—a reasonable jury could conclude beyond a reasonable doubt that Thomas committed evasion.

## B. *Deliberate Ignorance Instruction*

### 1. Standard of review and applicable law

Thomas claims there was insufficient factual basis to justify giving a deliberate ignorance instruction. Such an instruction is justified where "the evidence shows (1) subjective awareness of a high probability of the existence of illegal conduct and (2) purposeful contrivance to avoid learning of the illegal conduct." *United States v. Nguyen*, 493 F.3d 613, 619 (5th Cir. 2007) (internal quotation marks and citation omitted). Because Thomas objected to this instruction at trial, this court reviews its propriety for abuse of discretion. *Id.*

---

[7] The Government also disputes Thomas's contention that he had no duty to update his initial disclosures once circumstances changed, but briefed no argument on that point. We need not reach this issue, however, because without it there remains sufficient evidence in the record on which the jury could have found evasion.

2. <u>Discussion</u>

As an initial matter, the deliberate ignorance instruction pertains to "knowledge," which is not an element of evasion. The instruction, therefore, only properly pertains to the two counts of filing a false tax return. Thomas's argument in his opening brief is cursory. He argues, again, that he hired Bradley to avoid these problems and therefore did not intend to violate the law. That motivation and conduct do not negate the justification for giving a deliberate ignorance instruction under *Nguyen*. 493 F.3d at 619 (instruction appropriate where defendant subjectively aware of high probability of illegal conduct and engaged in purposeful contrivance to avoid learning of the illegal conduct).

Further, sufficient evidence existed to support the instruction. First, the evidence supports a "subjective awareness of a high probability of the existence of illegal conduct." *Id.* Thomas had first-hand knowledge that his personal and corporate gross income exceeded the reported gross income. Regarding corporate liabilities, Thomas clearly knew of the *Wiley* case's settlement and of his fees for $647,193, an amount exceeding his firm's reported gross income of $436,850. Bradley also testified that Thomas told him that Thomas kept a running log of the financial status of each case; therefore, Thomas had a sense of how much money his clients owed, which suggests knowledge of his firm's finances. Thomas made roughly $310,000 in personal expenditures in 1999. He very likely knew these purchases and various checks were greater than his reported gross personal income of $66,575. Moreover, in November 1999, Thomas submitted a financial statement to Cross Keys bank on which he listed his income as $200,000. This strongly suggested that Thomas knew both his corporate and individual gross incomes were larger than those reported—the "subjective awareness of a high probability of the existence of illegal conduct" that is the first prerequisite of a deliberate ignorance instruction. *Id.*

10

The evidence also supports finding the second prerequisite, "purposeful contrivance to avoid learning of the illegal conduct." *Id.* Thomas notes in his own brief his testimony that "he wanted to sign whatever Mr. Bradley placed in front of him." Also, Bradley was asked to discontinue sending monthly reports to Thomas, suggesting deliberate ignorance. Thomas's uncritical reliance on Bradley and his assistant, Hamilton, was more than enough evidence to support a jury instruction for deliberate ignorance regarding the first two counts of filing a false tax return. The trial court did not abuse its discretion by giving the instruction. *See United States v. Bieganowski*, 313 F.3d 264, 290–291 (5th Cir. 2002) (finding no abuse of discretion where a "jury could certainly infer from th[e] evidence that [defendant] could have been aware of the presence of fraud, but instead deliberately closed his eyes to it.").

## III. CONCLUSION

For the reasons set forth above, the judgment of the district court is AFFIRMED as to all counts.